MOTOR PRODUCTS CORPORATION, A NEW YORK CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.*

Docket No. 104980. Promulgated November 10, 1942.

*Thomas H. Adams, Esq.*, for the petitioner.
*Paul A. Sebastian, Esq.*, for the respondent.

TYSON: In this proceeding the respondent has determined the following deficiencies against the petitioner:

| Year | Income tax | Excess profits tax | Total |
|------|-----------|--------------------|-------|
| 1936 | $75, 573. 61 | $33, 992. 40 | $109, 566. 01 |
| 1937 | 24, 712. 67 | 14, 419. 30 | 39, 131. 97 |

The petitioner's assignments of error and the respondent's affirmative averments present the following issues:

First.—This issue involves the following questions: (a) Upon the sale by petitioner in 1936 and the redemption by the city of Detroit in 1937 of refunding bonds (series A) of that city, is the basis for determining gain or loss the cost to petitioner of defaulted bonds of that city which petitioner had purchased in 1931 and surrendered to the city in 1934 pursuant to a refunding agreement by which petitioner received, in lieu of such surrendered bonds, the refunding bonds series A, or is the basis the fair market value of the refunding bonds series A on the effective date of the exchange in 1934 because of such exchange being one resulting in gain or loss? (b) If there was a taxable exchange in 1934, did the respondent err in determin-

---

*Prior to October 22, 1942, this report was approved for promulgation.

ing that the effective date of such exchange was April 19 of that year?  (c) If there was a taxable exchange in 1934, was the amount received by the petitioner for the bonds redeemed by the city in 1937 in excess of the fair market value of the bonds issued in 1934 and exchanged for such redeemed bonds tax-free interest under section 22 (b) (4) of the Revenue Act of 1936 as interest on obligations of a political subdivision of a state?

Second.—Is petitioner entitled to a deduction of $37,930.12 in 1936 as a bad debt ascertained to be worthless and charged off in that year on the final settlement of a claim against the Willys-Overland Co., or, in the alternative, if not allowable as a bad debt deduction, did petitioner sustain a capital loss in such amount for that year? As to this second issue the respondent avers that if the Board finds the petitioner's claim against the Willys-Overland Co. was ascertained to be worthless in a year prior to 1936, the net income for 1936 should be increased by $12,429.90 representing a recovery on such claim in that year, and further avers that if the Board finds that there was an assignment of such claim by petitioner to Empire Securities, Inc., in 1936 and that the assignment was a sale or exchange of a capital asset, any deductible loss resulting therefrom was subject to the limitations of section 117 (d) of the Revenue Act of 1936.

Third.—Did petitioner sustain a deductible loss of $20,916.94 in 1936 on account of certain Southfield Storm Sewer Drain District bonds becoming worthless in that year?

Fourth.—Should.petitioner's excess profits tax for 1937 be recomputed on the basis of any additional income found by the Board for the year 1936?

Fifth.—Did respondent, in computing the credit for foreign taxes paid in 1936 and 1937, fail to take into consideration certain taxes paid and also certain additional income from sources, in Canada in each of those years, respectively?

The fifth issue has been disposed of by stipulation of the parties and effect thereto will be given in the recomputation under Rule 50, and, further, it is agreed that such recomputation will automatically dispose of the fourth issue.

The respondent in his answer affirmatively avers that the amount of the deficiency in income and excess profits taxes for 1936 as determined by him, is in error and that such amount should be increased to $114,910.86.

The petitioner prays that the Board redetermine that for the year 1936 there is a deficiency of $4,815 in income and excess profits taxes, and that for the year 1937 there is no deficiency in income and excess profits taxes, but, instead, an overpayment of $1,370.78 which was paid within three years before the filing of the petition herein.

The proceeding has been submitted upon the pleadings, testimony, documentary evidence, and a stipulation of facts embracing numerous exhibits. The stipulated facts not set forth are included herein by reference. The findings of fact and opinion as to each of the three issues in controversy will be set forth separately.

### FINDINGS OF FACT APPLICABLE TO ALL ISSUES.

The petitioner is, and was at all times material here, a New York corporation engaged in the business of manufacturing and selling automobile accessories and related articles. Its principal office is in Detroit, Michigan. Its returns for the taxable years in question were filed with and its income and excess profits taxes shown thereon were paid to the collector for the district of Michigan at Detroit. The last payment, in the amount of $73,000, for the year 1936 was made on December 13, 1937. The last payment, in the amount of $244,754.11, for the year 1937 was made on December 13, 1938. The petition herein was filed on September 26, 1940.

### FINDINGS OF FACT ON FIRST ISSUE.

The city of Detroit is a municipal corporation and a political subdivision of the State of Michigan.

During the year 1931 petitioner purchased 1,554 $1,000 city of Detroit 4½% refunding bonds (hereinafter sometimes called 1931 bonds) of an aggregate face value of $1,554,000, at a cost of $994.443314 per $1,000 bond, or a total cost of $1,545,364.91. Those bonds were part of a duly authorized issue of $22,000,000 face value 4½% coupon bonds payable to bearer in lawful money of the United States and pledged the "faith and credit of the City of Detroit" for the payment of the principal and interest thereof. At the time of petitioner's purchase thereof such bonds had attached thereto all unmatured coupons. The bonds were dated August 15, 1931, and matured, $10,000 on August 15, 1933, $279,000 on August 15, 1934, $600,000 on August 15, 1935, and $575,000 on August 15, 1936.

During the latter part of 1932 and the first part of 1933, the city of Detroit had been on the verge of default on its obligations. Its tax collections had fallen to about 65 percent, its approximately $33,000,000 of short term notes had been extended from time to time because they could not be paid, and it had outstanding a large amount of bonds falling due within a relatively short period. Because of that situation the market for the city's bonds had fallen considerably. On or about February 14, 1933, the banks of the State of Michigan were closed by proclamation of the governor of that state.

On and after February 14, 1933, the city of Detroit defaulted in the payment of interest maturing upon all its outstanding bonds, ex-

cept street railway bonds, which were an inconsequential part of its entire indebtedness, and it also defaulted in payment of the principal of all of its bonded indebtedness which matured on or after February 14, 1933.

Subsequent to such default by the city and shortly prior to June 6, 1933, a committee known as the City of Detroit, Michigan, Bondholders' Refunding Committee (hereinafter referred to as the committee) was formed for the purpose of securing concerted action in protecting the rights and interests of the holders of over $250,000,000 of the outstanding and unpaid bonds and obligations issued by the city of Detroit.

On June 6, 1933, the members of the committee executed a "Deposit Agreement," which was to be between the committee members executing the same as the "Committee," parties of the first part, and the "Depositors" thereunder, namely, such holders of the city's bonds and other obligations as should become the parties of the second part the same as if they had signed it, by depositing their bonds with designated depositaries and accepting a transferable "Certificate of Deposit" executed and issued by the depositary which should hold the deposited bonds as agent for the committee.

The deposit agreement provided, *inter alia*: that the bonds accompanied by all unpaid coupons should be deposited in negotiable form and with such assignments or other instruments as were required "to transfer absolute title to such bonds to the Committee," but that the committee might permit bondholders to become parties to the agreement without actual deposit of their bonds and coupons, by signing counterparts of the agreement, or in such other way as the committee in its discretion might determine; and that "each Depositor does hereby sell, assign and transfer" the deposited bonds and/or coupons to the committee "as Trustees of an express trust," with the legal title and all the rights and powers of the owners thereof.

The deposit agreement referred to a "Plan of Refinancing" set forth in the appendix thereto as the "Existing Plan" and authorized the committee to surrender and otherwise dispose of the deposited bonds and coupons in accordance with the plan and "to accept in exchange therefor the refunding bonds of the City as provided therein" and to distribute such refunding bonds to the respective depositors entitled thereto "at such time or times as in its discretion it deems advisable."

The deposit agreement gave the committee full power: to adopt the "Existing Plan" or to prepare and adopt other plans "for the readjustment or liquidation and settlement, in any manner whatsoever, of the indebtedness of said City, or any part thereof, or for the enforcement of the rights of the owners of bonds deposited under the terms of this agreement"; to take such action as might be necessary

to make any plan adopted effective, except that no plan which involved compromising, or reducing the principal or interest on deposited bonds should become effective without notice to and the right of withdrawal of such bonds by the depositors; to "surrender * * * any of the deposited bonds and/or coupons in exchange for an amount of refunding bonds of the city equal to the face value of the bonds and/or coupons so surrendered and bearing interest at a rate not less than that borne by the surrendered bonds"; or to abandon the "Existing Plan" or any other plan "notwithstanding that the same shall have been declared or have become effective", without release of the depositors from the agreement.

On June 27, 1933, the committee and the city of Detroit entered into an agreement involving a "Plan of Refunding and Debt Adjustment" (hereinafter referred to as the refunding agreement) which embraced the "Existing Plan" of refinancing set forth in the appendix to the deposit agreement of June 6, 1933.

The refunding agreement recites that since February 14, 1933, the city had been in default in meeting principal and interest on all of its outstanding bonds and notes, except street railway bonds defaulted only as to principal, and that the committee had entered into the deposit agreement of June 6, 1933, whereby the city's bond and note holders could transfer legal title thereto to the committee as trustees of an express trust with full power to enter into an agreement with the city "for the adjustment of the indebtedness represented by said bonds and notes and/or for the issuance of refunding bonds to extend the time of payment of the principal and/or interest of said outstanding bonds and notes."

The refunding agreement provides, inter alia: that the committee should represent the holders of the city's bonds and notes and should diligently solicit the deposit of bonds and notes and the consent of the holders thereof to the refunding plan; that the city should pay the expenses of the committee, but that the latter "shall not be deemed to be an employee or agent of the City," it being stipulated and agreed "that the Committee is an independent contractor, owning the legal title to the bonds and notes deposited with it"; and that the committee and its depositary should have complete supervision over and serve as the intermediary for the exchange of the refunding bonds for the city's outstanding bonds and notes.

The provisions of the refunding agreement apply generally to all classes of obligations to be refunded, except for certain special provisions relating to the refunding of water and of railway bonds and anticipation notes not involved herein. As to general obligations not supported by pledges of special revenues (including the 1931 bonds here involved) the agreement provides: that "each creditor of the City participating in the refunding plan contemplated by this Agree-

ment, shall, at the consummation thereof, surrender all bonds and/or notes to be refunded" and "in exchange" therefor should receive a principal amount of "City of Detroit _____ Refunding Bonds, Series A" (hereinafter sometimes referred to as series A bonds) "equal" to the principal amount of and bearing the "same rate of interest" borne by the surrendered bonds and notes; that outstanding bonds maturing on or before June 30, 1943, such as the 1931 bonds here involved, should be refunded with series A bonds dated as of the interest payment date of the bonds to be refunded preceding June 30, 1933, and maturing 30 years from such date; that outstanding bonds maturing after June 30, 1943, should be refunded with bonds maturing on the same date as the refunded bonds; that the city reserved the right to pay one-third of the interest maturing on the series A bonds during the first two years with refunding bonds, series C; that in exchange for interest due and unpaid on or before June 30, 1933, on bonds and notes so surrendered, and referred to as accumulated interest, the "creditor" should receive in satisfaction thereof a principal amount of registered refunding bonds, series B, equal to the amount of such accrued interest; that the series A bonds "shall be redeemable by the City on any interest payment date upon payment of par and accrued interest"; and that the form and validity of the refunding bonds "shall be subject to the approval of the attorneys for the Committee."

The refunding agreement further provides that the city should annually levy a sufficient tax upon all taxable property in the city to provide funds for the payment of interest upon all the refunding bonds and to provide for "sinking funds" for the retirement, at maturity, of all such bonds, the sinking funds to be kept in a special trust account. It further provides that upon the exchange the refunded bonds should be canceled and the sinking fund theretofore maintained for the retirement thereof should be paid into the sinking fund for the refunding bonds.

The refunding agreement further provides: that the refunding plan contemplated thereby should become effective when, in the judgment of the committee, a sufficient amount of outstanding bonds and notes should have been deposited with the committee, or the refunding of which had been contracted for; that when the committee should have declared the plan effective and notified the city, the latter should exchange the refunding bonds for the bonds and notes embraced in the agreement; and that the refunding agreement should expire at a specified time unless extended in writing by the parties.

On June 27, 1933, the committee and the city of Detroit also entered into a further agreement, to the effect that until the "consummation" of the refunding plan the city would disburse daily pro rata to the creditors entitled thereto, upon surrender of matured interest coupons

or other evidences of indebtedness, the proceeds of all taxes levied for debt service prior to such consummation; that, to the extent of such interest payments, coupons should be detached from the series A bonds at delivery thereof; and that the committee for the purposes of the agreement should be deemed a single creditor with respect to all bonds deposited with it and all refunding bonds delivered in exchange therefor.

Subsequent to its formation, the committee appointed depositaries and spent considerable money and time in soliciting the deposit of bonds under the deposit agreement, and the periods for making such deposits were extended from time to time. Certificates of deposit were issued to bondholders who actually deposited their bonds and they thereby became bound by the terms of the deposit agreement, including the right to participate in the contemplated exchange or to the return of their old bonds in the event a refunding plan was not ultimately consummated. As to the bondholders who were unwilling to surrender to the committee the physical possession of their bonds until the contemplated refunding bonds were ready for delivery, so-called special agreements were entered into between such bondholders and the committee and the bonds covered by such agreements were regarded as pledged to the refunding plan.

The petitioner herein did not deposit any of its 1931 bonds of the city of Detroit with the committee's depositary, but retained the possession thereof until a time as hereinafter mentioned, but, on December 14, 1933, entered into a special agreement with the committee. That agreement sets forth, *inter alia*, that the petitioner, referred to as the depositor, was the owner of defaulted 1931 bonds of the city of Detroit in the principal amount of $1,554,000 with attached interest coupons and that the committee had been created under the deposit agreement of June 6, 1933, for the purpose of protecting the rights and interests of holders of the city's bonds, and provided as follows:

* * * it is Hereby Agreed that the Depositor is made a party to said Deposit Agreement dated June 6, 1933, including the plan of refinancing set forth in the Appendix thereof, as to all of the bonds and coupons described in the schedule appearing on the reverse hereof without the actual or physical deposit of such bonds and coupons, and the Depositor hereby agrees to be bound by all of the provisions of said Deposit Agreement * * *, and the Committee agrees that it will fully perform all its duties set forth in said Deposit Agreement and that the Depositor shall be entitled to the rights and privileges afforded to depositors by said Deposit Agreement.

The Depositor further agrees that as and when the Committee deems it necessary to require the actual and physical surrender or deposit of the said bonds, it will concurrently with the issuance and delivery to it of new refunding bonds, forthwith surrender the original bonds to the Committee, to be held by it and disposed of under the terms of the said Deposit Agreement. The Depositor

further agrees to deliver to the Committee the coupons attached to said bonds as they severally mature.

On or about December 14, 1933, the petitioner detached from its 1931 bonds the coupons due August 15, 1933, and delivered the same to the depositary and prior to December 31, 1933, petitioner received two-thirds of the interest due on August 15, 1933, on such bonds. Through the same procedure during 1934 the petitioner received two-thirds of the interest due on such bonds on February 15, 1934. Similar distributions of interest were made to those persons who had actually deposited their bonds and coupons with the depositary of the committee and had received certificates of deposit therefor. In the payment of such interest the only difference made as between the holders of certificates of deposit and those who had special agreements, as did petitioner, was that as to the latter the committee had to request the bondholder to itself detach the coupons representing interest due and deposit them for payment, while as to the former the committee itself detached such coupons.

In April 1934 the committee had secured deposits and pledges of about 92 percent of the city of Detroit's bonds and notes and felt that such percentage was sufficient to warrant declaring the plan operative and also felt that such declaration would attract and accelerate further deposits because the various holders of about $20,000,000 of bonds would not become parties to the deposit agreement until they knew that the refunding plan would be operative.

On April 19, 1934, the committee, pursuant to the refunding agreement of June 27, 1933, with the city of Detroit, adopted a resolution wherein it "hereby declares the Refunding Plan, contemplated by said agreement, effective forthwith and hereby determines to consummate said Plan" by exchange of the city's outstanding bonds for its refunding bonds, "subject to the approval" of counsel for the committee of all details in the consummation of the plan and of the "refunding bonds as valid and legally binding obligations of the City of Detroit" and also subject to the proceedings of the common council and the officers of the city authorizing the issuance of the refunding bonds. In adopting that resolution the committee was fully aware of the fact that the refunding plan could not be actually consummated until the validity of the refunding bonds had been approved by the committee's counsel and it was also aware of the attending difficulties such counsel would encounter, as is hereinafter mentioned, in locating the resolutions authorizing the issuance of the several hundred outstanding bond issues involved, some quite old and some originally issued by townships annexed by the city of Detroit. Subsequent to the adoption of the resolution, the committee continued its efforts to secure additional deposits of bonds under the deposit agreement.

On May 8, 1934, the Common Council of the City of Detroit adopted a resolution, authorizing the issuance of refunding bonds in accordance with the refunding agreement of June 27, 1933. Such resolution set forth the form of the refunding bonds, series A, to be issued pursuant to the refunding agreement; provided for the same designation as to purpose as that contained in the refunded bonds; and further provided that there should be printed on the back of such series A bonds, *inter alia*, "The original opinion of Messrs. Thompson, Wood & Hoffman, attorneys-at-law, New York, relative to the legality of the within bond and certified copies of the legal papers are filed for the inspection of the holders hereof with the Controller of the City of Detroit." This resolution was subsequently amended as to certain details and the correction of errors not material here.

With reference to the refunding of the outstanding 1931 bonds held by petitioner herein, such resolution provided for the issuance of new full faith and credit $1,000 face value 4½% refunding bonds, series A, maturing 30 years from the date of February 15, 1933, thereof and subject to redemption at par and accrued interest upon any interest payment date.

Due to the difficulties encountered by the committee's counsel in locating authorizations for the issuance of the old bonds and to the doubts of counsel as to their being able to give a supporting opinion of validity as to some of the old bond issues and, also, in order to simplify the work necessary to such approval, Public Act No. 31, Special Session 1934, was enacted by the Legislature of Michigan, validating the old bonds involved in the refunding. However, in a test case, the Supreme Court of Michigan, on September 18, 1934, held that such act was unconstitutional and thereafter counsel for the committee spent weeks searching records for authorizations for issuance of the various issues of bonds to be refunded.

Shortly prior to October 3, 1934, the committee published a notice stating, *inter alia*, that the new refunding bonds to be issued in accordance with the refunding agreement of June 27, 1933, would be available for delivery on or about November 15, 1934, in exchange for certificates of deposit and that those refunding bonds, accompanied by the legal opinion of counsel, would be obtainable only through the committee. At that same time petitioner received advice that if it desired prompt delivery of refunding bonds, series A, it should immediately deposit its old 1931 refunding bonds. On or about October 3, 1934, the petitioner delivered all of its 1931 refunding bonds and the attached coupons to the depositary.

Preparation of the numerous issues, for designated purposes, of the refunding bonds, series A, involved a great deal of work and consumed a considerable period of time. On or about November 19, 1934,

the committee received a signed copy of its counsel's written opinion addressed to the city of Detroit, that such counsel had examined and approved the validity of a long list of various issues of refunding bonds, series A, and also series B, C, D, and E, involved in the refunding plan, each issue being designated respectively as to the particular purpose thereof. Included therein was the issue of 4½% refunding bonds, series A, subsequently received by petitioner. That legal opinion was filed in the office of the Controller of the City of Detroit and was the only opinion given as to the validity of the bonds listed therein.

On November 22, 1934, the committee published a notice that "The new refunding bonds issued in accordance with the terms of the Plan for refunding the debt of the City of Detroit ARE NOW READY FOR DELIVERY" and that to secure the new bonds, certificates of deposit, properly endorsed, should be forwarded to the depositary. November 22, 1934, was the first date on which the new refunding bonds, series A, were available for delivery. That date was the effective date of the exchange involved herein. When such bonds were delivered to the persons entitled thereto they were accompanied by a copy of the opinion of the committee's counsel as to the validity thereof.

On or about December 13, 1934, and in exchange for the defaulted 1,554 $1,000 city of Detroit 4½% 1931 refunding bonds deposited by it, the petitioner received from the depositary 1,554 $1,000 city of Detroit 4½% refunding bonds, series A. The bonds so received were dated as of February 15, 1933, and matured on February 15, 1963, but were subject to redemption by the city at par and accrued interest on any interest payment date. The bonds were coupon bonds payable to bearer in lawful money of the United States, except that the city reserved the right to pay with series C bonds in lieu of money a certain portion of the interest accruing thereon during the first two years after date thereof, as provided in the refunding agreement. The bonds stated that they were lawfully issued for the purpose of refunding a like amount of valid outstanding funded indebtedness of the city and that "the full faith and credit of the City of Detroit is hereby irrevocably pledged" for the payment of the principal and interest thereon. At the time of the receipt of such bonds by petitioner interest coupons designated 3B had been detached. Upon petitioner's receipt of those bonds no new entry was made on its books of account because it was thought that such new bonds were the same kind and represented the same investment as the surrendered 1931 bonds already entered on its books.

At the time petitioner received the above mentioned refunding bonds, series A, in December 1934, it also received, pursuant to the refunding plan, series B and C bonds in stipulated principal amounts representing one-third of the interest accrued on February 15, 1933,

August 15, 1933, February 15, 1934, and August 15, 1934, on its 1931 refunding bonds prior to the date of delivery of the series A bonds.

The market value of certificates of deposit for 1931 bonds per $100 face value, which value was also the market value of the bonds, was $79 on or about April 19 and May 8, 1934, and was $79.50 on or about October 3, 1934. The market value on or about November 22, 1934, of the refunding bonds, series A, on a "when, as and if issued" basis, was $88 and accrued interest per $100 face value of bonds. The market value on or about December 13, 1934, of the 4½% refunding bonds, series A, was $89 and accrued interest per $100 face value of bonds. It is stipulated that if either of the above dates is determined herein to be the applicable date for determining the amount of gain involved in this proceeding (i. e., the effective date of a taxable exchange in 1934), then the market value on such date shall be considered the cost basis of petitioner's series A bonds. The refunding bonds, series A, and the 1931 bonds exchanged therefor had the same fair market value on November 22, 1934, the date of the exchange.

The refunding agreement did not create any new liabilities of the city to new or different creditors, but accomplished the purpose of eliminating the default and the granting of an extension of time for the city's payment of outstanding indebtedness with the same rate of interest thereon through the substitution of new evidence of such outstanding indebtedness.

In 1936 the petitioner sold $1,000,000 principal face value of its refunding bonds, series A, and received therefor the sum of $1,008,091.29.

In 1937 the city of Detroit called for redemption and redeemed $554,000 principal face value of refunding bonds, series A, held by petitioner, and the latter received therefor the sum of $554,000.

On February 15, 1937, the city of Detroit called all its new refunding bonds, series A, for redemption and redeemed same.

In its return for 1936 the petitioner reported a profit of $13,648.30 upon its sale of $1,000,000 face value of refunding bonds, series A, in that year, and on its return for 1937 it reported a profit of $3,078.08 upon the redemption of $554,000 face value of refunding bonds, series A, in that year, based on the cost of its 1931 bonds exchanged for such series A bonds. For each year respondent determined that the transaction in 1934 pursuant to the refunding plan was a taxable exchange; that such plan, and thus also the exchange, became effective on April 19, 1934; that the market value of the series A bonds on the latter date was $77 per $100 face value; and that petitioner realized a taxable profit of $238,091.29 upon the sale in 1936 and a taxable profit of $127,420 upon the redemption in 1937.

OPINION ON FIRST ISSUE.

The first issue presents several questions. The primary question is whether the petitioner's surrender of its 1931 bonds and its receipt of refunding bonds, series A, in lieu thereof in 1934 pursuant to the deposit and the refunding agreements was a transaction constituting a "sale or exchange of property" resulting in the realization of recognized gain or loss within section 112 (a) of the Revenue Act of 1934. The respondent has determined, and now contends, that in the 1934 transaction the petitioner disposed of its 1931 bonds and received in exchange therefor new and substantially different refunding bonds, series A, resulting in a realized loss, in 1934, in the amount of the difference between the cost of the 1931 bonds and the market value of the refunding bonds, series A, so received and as a result, that in computing the gain realized by petitioner upon the sale in 1936 and the redemption in 1937 of its refunding bonds, series A, the basis is the fair market value of such series A bonds on the effective date of the exchange in 1934. The petitioner contends that the 1934 transaction was not a taxable "exchange of property", but only a substitution of bonds evidencing the same continuing indebtedness of the city, as to which indebtedness the refunding plan was in essence only an agreed extension of time for payment thereof by the city and that the cost of the 1931 bonds is the proper basis for determining the gain realized upon its disposition of the refunding bonds, series A, in the taxable years involved.

Our findings of fact set forth the pertinent provisions of the deposit agreement of June 6, 1933, between the depositors of defaulted bonds and notes of the city of Detroit and the committee created thereby to represent and protect the interests of such depositors and, also, the pertinent provisions of the refunding agreement of June 27, 1933, between that committee and the city for the refunding of the city's outstanding indebtedness.

Under the deposit agreement the committee was empowered to hold legal title to the bonds and notes deposited with its depositary, as trustee of an express trust, with broad powers incident to the performance of its duties relating to the interests of the depositors, the city's creditors, and to the consummation of the proposed refunding plan or such other agreement as it might enter into with the city relating to the latter's outstanding defaulted indebtedness.

The petitioner herein did not physically deposit its defaulted 1931 bonds with the committee's depositary under the deposit agreement, but pursuant to the terms of the special agreement entered into with the committee on December 14, 1933, it agreed to surrender such bonds to the committee concurrently with the issuance and delivery to it of the new refunding bonds, and it thereby became a depositor

under and bound by all the other provisions of the deposit agreement and also the refunding agreement.

The refunding agreement sets forth that the committee had "full power to enter into an agreement or agreements with the City for the adjustment of the indebtedness represented by said bonds and notes and/or for the issuance of refunding bonds to extend the time of payment of the principal and/or interest of said outstanding bonds and notes." Aside from the numerous provisions as to procedural matters, such agreement provided: that at the consummation thereof each participating "creditor of the City" should surrender his defaulted bonds and notes to be refunded and "in exchange" therefor should receive refunding bonds, series A, "equal" to the principal amount of and bearing the "same rate of interest" borne by the surrendered bonds and notes; that outstanding bonds maturing after June 30, 1943, should be refunded with refunding bonds, series A, bearing the same maturity dates; that outstanding bonds maturing on or before June 30, 1943, should be refunded with refunding bonds, series A, maturing 30 years from date thereof; and that the city reserved the option to redeem the refunding bonds, series A, at par with accrued interest on any interest payment date and also the option to pay a certain portion of the interest thereon in refunding bonds, series B and C.

The effect of the refunding agreement was not to provide for the creation of any new indebtedness of the city of Detroit, or for a scaling down of the principal amount of the city's then existing indebtedness, or for a change in the fixed rate of interest thereon, but, instead, was to provide for the elimination of the city's default through the issuance of the refunding bonds, series A, in lieu of the various outstanding issues of defaulted bonds and notes so as to extend the time for payment by the city of its then existing obligations on the refunded bonds and notes, including both principal and accrued interest.

Without the new issues of refunding bonds, series A, the city's outstanding bonds and notes would have remained in default and as a matter of necessity the series A bonds bore dates of issuance which differed from the dates of issuance of the several hundred issues of defaulted bonds and notes. However, the dates of issuance of the refunding bonds, series A, were fixed as of the interest payment date of the respective refunded bonds next preceding June 30, 1933. Although the series A bonds were so dated, they did not become available for delivery until November 22, 1934, and, pursuant to the refunding plan, the city of Detroit paid interest maturing on the defaulted bonds during 1933 and 1934 prior to the actual issuance of the series A bonds, and before the delivery of the latter bonds there were detached therefrom coupons representing the equivalent amount

of accrued interest so paid on the defaulted bonds. Thus there was an overlapping of interest periods as between the defaulted bonds and the refunding bonds, series A.

In our opinion, the refunding agreement to which this petitioner was a party presented a plan whereby the city of Detroit merely issued new bonds in substitution for and in continuation of outstanding evidences of its former bonded indebtedness and the result of the transaction was merely to effectuate an extension of time for payment of that portion of the former bonded indebtedness originally maturing on or before June 30, 1943 (and also an extension for payment of a certain portion of the interest accruing thereon through the issuance of series B and C bonds), such extension being coupled with an option to the city of paying off the indebtedness represented by the refunding bonds, series A, at par with accrued interest on any interest payment date. The city assumed no additional obligation under the refunding agreement or upon the refunding bonds, series A, since upon the consummation of the refunding agreement through the issuance of such series A bonds there existed the same debtor, the same principal amount of indebtedness, the same rate of interest thereon, the same provision for a sinking fund, and the same creditors. Certainly, from the standpoint of the city of Detroit the essence of the 1934 transaction was an exchange constituting merely a substitution of the evidence of the same continuing debt. See *Sun Pipe Line Co.*, 42 B. T. A. 1413 (and authorities cited therein); aff'd., 126 Fed. (2d) 888, holding that as to the debtor the refunding of outstanding bonds creates no new indebtedness. Also cf. *Harden F. Taylor*, 43 B. T. A. 563, 566, 567; affirmed per curiam, 128 Fed. (2d) 885; *California Delta Farms, Inc.*, 6 B. T. A. 1301; and *Rindge Land & Navigation Co.*, 2 B. T. A. 1179, 1189. The facts here afford stronger support for the conclusion that the refunding bonds involved were merely a continuation of the indebtedness of the city of Detroit as theretofore evidenced by its 1931 bonds than do the facts in the *Sun Pipe Line Co.* case, *supra*, for the conclusion there reached with regard to the bonds there involved; for, in that case, the bonds which were held to constitute a continuation of an indebtedness theretofore evidenced by other bonds of a prior issue were bonds which bore a different rate of interest from the prior issue of bonds and were not exchanged as here with the holders of the prior issue of bonds, but were sold to other parties and the proceeds thereof applied in redemption of the prior issue of bonds.

Our conclusion in the foregoing paragraph is supported, in addition to the authorities cited in that paragraph, by the decision of the Supreme Court of Michigan in *Wilcox* v. *Board of Commissioners of Sinking Fund of City of Detroit*, 262 Mich. 699; 247 N. W. 923. That case was one in which a declaratory judgment was authorized by the court and involved the question of whether refunding bonds issued

subsequent to the adoption of a Michigan constitutional amendment, in lieu of and in exchange for bonds issued prior to such adoption, came within the exception contained in that amendment. The amendment provided as follows: "The total amount of taxes assessed against property for all purposes in any one year shall not exceed one and one-half per cent of the assessed valuation of said property, except taxes levied for the payment of interest and principal on obligations *heretofore incurred*." [Italics supplied.] The court held that the refunding bonds issued subsequent to the adoption of the constitutional amendment came within the exception contained in that amendment, saying: "Direct refunding bonds issued in lieu of and exchanged for prior bonds in the same principal amount are a continuance of the obligation and within the exception."

Our foregoing conclusion as to the city of Detroit is, in our opinion, equally applicable to petitioner herein, for if the refunding bonds, series A, were a continuation of the indebtedness theretofore evidenced by the 1931 bonds, so far as the city of Detroit as the debtor in both series of bonds is concerned, they were likewise necessarily a continuation of that indebtedness so far as the petitioner is concerned as creditor in both series of bonds.

The petitioner did not receive, in the 1934 transaction, any property having a value different from the value of the property it owned prior thereto, but merely received new evidence of a continuing debt to it. The city's debt to petitioner was identically the same and the new evidence of that debt, refunding bonds, series A, was substantially identical in form with the old evidence thereof, the 1931 bonds exchanged therefor. Both were full faith and credit coupon bonds of the same denomination, evidencing an indebtedness of the city of Detroit for the same designated purpose; both were in the same principal amount, payable to bearer in lawful money of the United States; both bore the same rate of interest; and for both a sinking fund was provided for the payment of principal when due. Although they had different maturity dates, such dates were of little or no significance to petitioner as a creditor of the city, for the city under the old defaulted bonds could have paid off any part or all thereof while they remained in default at any time funds were available and it likewise could have paid off any part or all of the new bonds, under its option, at any time when the first semiannual interest payment on the new bonds became due and funds were available; and in fact the city called for redemption all its new refunding bonds, series A, on February 15, 1937, and redeemed same. In this respect, from the standpoint of both the city and petitioner, the new bonds differed but little from the old bonds with regard to the time when they could be paid off. Furthermore, the 1931 bonds and the series A bonds had the same fair market value on the date of the exchange.

Not only were the new refunding bonds a mere continuation of an indebtedness of the city of Detroit as theretofore evidenced by its 1931 bonds, within the rule announced in *Sun Pipe Line Co.*, *supra*, but, in our opinion, the exchange of the 1931 bonds for the refunding bonds, series A, was one in which no loss or gain is to be recognized under the rule established in *Weiss* v. *Stearn*, 265 U. S. 242, and the authorities cited therein, inasmuch as because the latter bonds were of the same value as that of the former bonds on the date of the exchange the property interest of petitioner in the indebtedness of the city of Detroit to it remained the same after the exchange as it was before.

We conclude that, in the 1934 transaction pursuant to the refunding agreement, this petitioner in surrendering its 1931 bonds and receiving in lieu thereof refunding bonds, series A, did not make a taxable "exchange of property" resulting in any realization of recognized gain or loss within section 112 (a), *supra*.

We further conclude that respondent erred in not using the petitioner's cost basis for its original 1931 bonds in determining the gain realized by petitioner upon its sale in 1936 and the city's redemption in 1937 of petitioner's refunding bonds, series A.

Furthermore, it may be said that if the petitioner's exchange of bonds for bonds in the 1934 transaction could be held to be an "exchange of property" within section 112 (a), *supra*, and one falling outside of the excepted reorganization provisions of section 112, which we think it does because the city of Detroit is a municipal corporation, *Speedway Water Co.* v. *United States*, 100 Fed. (2d) 636, it would nevertheless still appear that the respondent erred in his determination. *Marie Hanlin et al.*, *Executors*, 38 B. T. A. 811; affd., 108 Fed. (2d) 429; *Margaret E. Kidder*, 30 B. T. A. 59. The 1931 bonds were in default and could be paid at any time funds were available to the city. The series A bonds for which the 1931 bonds were exchanged provided that they could be redeemed at any interest payment date. The interest payment dates on series A bonds being every six months, the only difference in point of time as to the right of redemption of the respective series of bonds is that the 1931 bonds could have been redeemed at any time funds became available, while the series A bonds could not have been redeemed until the expiration of a six months interest payment date even if funds were available— a possible difference of six months between the times the 1931 bonds and the series A bonds could have been redeemed. This slight difference as to possible dates of redemption would not, in our opinion, prevent application of the rule established in *Marie Hanlin et al.*, *Executors*, *supra*, as to the Omaha bonds there involved. Also, since the value of both series of bonds was the same at the time of the exchange, there could have been no gain or loss on such exchange and

this, together with the other similarities between the two series of bonds, would, in our opinion, render those series substantially identical, and we so hold. Cf. *Margaret E. Kidder, supra*. The facts show that the market value on November 22, 1934, the date of the exchange of petitioner's 1931 bonds, was less than the cost thereof and, the new and old bonds being substantially identical, no deductible loss would have been allowable under section 118 of the Revenue Act of 1934, and the basis for gain or loss in the taxable years would be as provided in section 113 (a) (10) of the Revenue Act of 1936.

Our conclusion on the first question involved in the first issue renders it unnecessary to pass upon the other questions presented by that issue.

### FINDINGS OF FACT ON THE SECOND ISSUE.

In the first part of 1933 the Willys-Overland Co. was indebted to petitioner, for materials sold and delivered to it, in the amount of $50,361.02, as evidenced by ninety-day notes which had been taken to close an open account. Also during the first part of 1933 the Willys-Overland Co. notified petitioner that it was unable to make payment on such notes.

On February 15, 1933, receivers were appointed for the Willys-Overland Co. by the Federal District Court at Toledo, Ohio. Within a few days thereafter a creditors' committee was organized to represent that company's unsecured creditors. The petitioner did not deposit its claim against the Willys-Overland Co. with that committee, but was fully advised on all developments with reference to the affairs of the Willys-Overland Co. and its claim against that company through constant communication with petitioner's credit source of information, whose manager was a member of the committee's set-up.

On June 21, 1933, the indebtedness of the Willys-Overland Co. to petitioner was written down to one dollar and the amount of $50,360.02 was charged to the reserve for bad debts carried on petitioner's books. Such charge-off was made pursuant to petitioner's usual practice in handling bad accounts. The above mentioned charge-off of the Willys-Overland indebtedness has never been reinstated or changed on petitioner's books.

On or shortly after September 8, 1933, the petitioner filed in the Federal District Court at Toledo a proof of claim on account of the Willys-Overland Co.'s indebtedness to it.

The Willys-Overland Co. was engaged in the business of manufacturing automobiles and the receivers appointed by the court on February 15, 1933, continued to operate that business during 1933 and thereafter. During and at the close of 1933 the Willys-Overland Co. had outstanding large commitments for materials ordered but not delivered and it was not known to what extent claims thereon would

be provable in the receivership proceedings. It also had outstanding substantial amounts of other unsecured claims against it and a $2,000,-000 first mortgage bond issue on substantially all its assets. At the close of 1933 a special master, appointed by the court in the receivership proceedings, was holding hearings with respect to the adjudication of unsecured claims against the company. During 1933 the trustee under the mortgage bonds filed a bill in the Federal District Court at Toledo to foreclose the mortgage and at the close of that year a special master was holding hearings to adjudicate a dispute between the bondholders and the general creditors as to the extent to which the company's assets were covered by the mortgage lien. At the close of 1933 the creditors' committee did not know what amount, if any, might be ultimately paid to the company's unsecured creditors.

In the petitioner's tax return for 1933, prepared by its auditors from its book records, a bad debt deduction was claimed in the amount of $50,360.02, based upon the above mentioned charge to its reserve for bad debts. For that year petitioner sustained a net loss greatly in excess of such claimed bad debt deduction and petitioner secured no tax benefit in 1933 by reason of such deduction.

The above mentioned receivership proceedings, including the hearing before the special master, were continued until a reorganization of the Willys-Overland Co. under section 77–B of the Bankruptcy Act, approved by the court in August 1936, was consummated in October 1936. In connection with and for the purpose of effectuating such reorganization certain interested parties organized Empire Securities, Inc., to acquire a majority of the bonds of and the unsecured claims against the Willys-Overland Co.

On February 25, 1936, the petitioner and Empire Securities, Inc., executed a written instrument designated an assignment, whereby the latter agreed to pay to petitioner as "a creditor of the Willys-Overland Company" an amount equal to "25% of the indebtedness" of that company to petitioner "as may be allowed by the United States District Court in the receivership proceedings" or any proceedings for reorganization of the Willys-Overland Co., on condition that on or before March 1, 1936, Empire Securities, Inc., acquired at least 67 percent of the outstanding bonds of and unsecured claims against the Willys-Overland Co. Pursuant to that assignment, and on account of the above mentioned Willys-Overland Co.'s indebtedness to it, the petitioner received the total amount of $12,429.90, one-half of which was paid in May and the other half in October of 1936. The $12,-429.90 so received represented 25 percent of the petitioner's then existing and allowed claim against the Willys-Overland Co., which presumably had been reduced to the amount of $49,719.59, and also represented the petitioner's final recovery on such indebtedness to it.

For the taxable year 1936 the petitioner claimed and the respondent

disallowed a bad debt deduction in the amount of $37,930.12 on account of the above mentioned indebtedness.

OPINION ON SECOND ISSUE.

The second issue presents several alternative questions. The primary question is whether petitioner is entitled to a bad debt deduction in 1936 for the difference between the amount recovered in that year and the amount charged off its books in 1933 on account of an indebtedness of the Willys-Overland Co. to petitioner.

The petitioner contends that the debt, to the extent of the unrecovered balance thereof in 1936, was first ascertained to be worthless in 1936 and that the charge-off of the entire amount thereof in 1933, except for one dollar, was made through inadvertence, because the debt did not become and was not ascertained to be worthless during 1933.

In our opinion there is a failure of proof to sustain the petitioner's contention. The record discloses that during 1933 petitioner was fully advised on all developments respecting its claim against the Willys-Overland Co., and that the charge thereof to its reserve for bad debts in 1933 was made pursuant to petitioner's usual practice in handling bad accounts. It is not to be presumed that petitioner follows the practice of charging off debts without ascertainment of the extent of their worthlessness. During 1933 and until the taxable year 1936 no subsequent change or correction was made in that 1933 charge-off. Furthermore, there is no testimony that would justify us in finding that there was no ascertainment of worthlessness of the debt by petitioner during 1933. An officer of the petitioner and an officer of the creditors' committee testified to the purport that during 1933 it could not be determined with any degree of certainty what amount, if any, might be paid on the claims of unsecured creditors of the Willys-Overland Co., but that they believed that such claims had some value. "Honesty of belief in the taxpayer is not conclusive, nor binding on the board. It is the province of the board to determine, on a review of all the facts and circumstances surrounding the particular debt sought to be deducted, whether the taxpayer knew or ought to have known its worthlessness * * *." *Avery* v. *Commissioner*, 22 Fed. (2d) 6, 8. The conclusions of those two witnesses are based upon very general statements concerning the receivership and condition of the Willys-Overland Co. during 1933 and subsequent years, but are entirely unsupported by any evidence showing the actual financial condition of that company in 1933 from which this Board could draw its own conclusions as to whether or not the debt was worthless in 1933.

In our opinion, the charge-off of the Willys-Overland Co. debt in 1933 and the deduction thereof on .petitioner's 1933 tax return as a bad debt have not been shown to be erroneous and must stand as a proper bad debt deduction for the taxable year 1933. Accordingly, petitioner is not entitled to the claimed bad debt deduction of $37,-930.12, or any part thereof, for the year 1936 on account of the Willys-Overland Co. debt, as has been determined by the respondent. *Ludlow Valve Manufacturing Co.* v. *Durey*, 62 Fed. (2d) 508.

As to this second issue, the respondent affirmatively avers that the petitioner's receipt of $12,429.90 in 1936 on its assignment of the Willys-Overland Co. debt in the manner set out in our findings of fact should be included in petitioner's gross income for 1936. That amount was received by petitioner in 1936 in connection with a reorganization of the Willys-Overland Co. and represented an amount received by petitioner on account of that company's indebtedness to it. The petitioner having received no tax benefit for the claimed bad debt deduction in 1933, the receipt by it of the amount of $12,429.90 on account of such debt in 1936 was not taxable income for the latter year. *Citizens State Bank*, 46 B. T. A. 964, and the authorities cited therein. In reaching this conclusion we have carefully considered the recent cases of *Helvering* v. *State-Planters Bank & Trust Co.*, 130 Fed. (2d) 44, reversing 45 B. T. A. 630, and *Commissioner* v. *United States & International Securities Corporation*, 130 Fed. (2d) 894, reversing a memorandum opinion of this Board, but notwithstanding the profound respect we entertain for the courts' opinions therein, we are constrained to, and do, adhere to the rule established in the cases relied on to support our conclusion.

The foregoing conclusions obviate the necessity of passing upon the other questions presented on the second issue.

### FINDINGS OF FACT ON THE THIRD ISSUE.

In 1928 the petitioner, at a cost to it of $52,041.94, purchased $50,000 face value Southfield Storm Sewer Drain District bonds having a par value of $1,000 each.

In certain litigation involving that bond issue, the Circuit Court for the County of Oakland, Michigan, on December 13, 1932, entered a supplemental decree providing, *inter alia*, that 262 bonds of such issue acquired by Oakland County Sinking Fund Commissioners be canceled; that the remaining 2,268 outstanding bonds of the issue "are hereby declared invalid, insofar as same set forth obligations of Southfield Storm Sewer Drain District and Oakland County, or any taxpayer or assessable property therein, but shall be regarded as evidence of the right of the holders to participate in sums to be obtained by Receivers hereinafter appointed." The decree further provided

that certain named persons be appointed receivers, to act on behalf of the holders of 2,268 bonds; to receive all funds to be paid over by Oakland County, certain banks, and surety companies, as therein set forth, and after payment of expenses to distribute such funds pro rata to the bondholders; to participate in suits for the collection of funds payable to the receivers; to compromise and settle claims, subject to the approval of the court; and to collect and disburse pro rata to bondholders such funds as might be paid to the receivers for the right to incorporate the completed portion of the Southfield Storm Sewer Drain "with any future drain or sewer." The decree further provided that Oakland County withdraw certain bank deposits which the court found to be Southfield Storm Sewer Drain District funds and pay therefrom specified amounts to various persons, including $445,593.65 principal amount to be paid to the receivers; that when the receivers should have been paid or obtained from the drain fund $1,360,800, plus interest collected upon bank deposits of the drain fund and interest collected from depositary sureties, they should have no further right in the drain fund and Oakland County should then have complete control of subsequent actions to be taken with respect to the collection of penalties, of depositary bonds, and amounts from closed banks; that the drain fund was entitled to receive specified large amounts from certain banks and sureties upon depositary bonds, some of which bonds were directed to be assigned by Oakland County to the receivers, and upon some of such bonds the receivers and Oakland County were directed to commence suits; that the receivers should first make payment of certain expenses and then make pro rata distributions to the bondholders only upon such bonds as should have been deposited with the receivers and by them delivered to the county treasurer for cancellation; that the County of Oakland and the Drain Commissioner of Oakland County be "perpetually restrained" from incorporating the drainage work already completed into any new county or township drain or sewer unless the amount of $497,690.68, representing that part of the construction costs thereof paid out of the drain fund, or a lesser amount if approved by the court, be paid to the receivers; and that the court retain jurisdiction of the proceedings to carry into effect the provisions of its decree.

At the time of the entry of the decree on December 13, 1932, it was uncertain as to what amounts would be recovered by the receivers for distribution to the bondholders. Neither the bonds held by the bondholders nor any definite portion thereof became worthless during 1932.

After their appointments the receivers commenced suits against the depositary sureties of certain closed banks. These suits were vigorously contested and the last one thereof to be terminated was concluded in 1936 upon the payment of a considerable sum of money.

From time to time the receivers made pro rata distributions to the bondholders which up to September 10, 1936, had amounted to 50 percent of the face value of the bonds, and on that date they made a distribution amounting to 12¼ percent. After the latter distribution the receivers had remaining on hand for possible future distributions assets consisting of $5,035.62 in cash, out of which some undetermined and undisclosed expenses would have to be paid; the sum of $24,388, impounded in a closed bank; and the receivers' right, as decreed by the court, to receive payment of $497,690.68, or a lesser amount if approved by the court, if the completed portion of the Southfield Storm Sewer Drain was incorporated in any other drain or sewer at any time in the future. At the time of the September 10, 1936, distribution the receivers advised the bondholders as to such assets and, further, that "little hope can be entertained of any appreciable sum being realized" from the rights in the completed portion of the storm drain. In 1935 or 1936 the receivers made one effort to dispose of their interest or rights in the storm drain to the principal owner of property in one of the subdivision developments in the area of the drainage district, but said property owner was not interested in acquiring such rights and no further efforts were made by the receivers to dispose of those rights. However, the rights were not known or ascertained by the receivers to be worthless in 1936.

Subsequent to December 31, 1936, the receivers made distributions out of the above mentioned cash and impounded funds amounting to $6.25 on June 30, 1938, and $5.85 on December 20, 1940, on each of the 2,268 $1,000 bonds. The receivers have not yet been discharged, partly because of their rights in the completed portion of the storm drain under the court's decree of December 13, 1932.

On account of its $50,000 Southfield Storm Sewer Drain District bonds purchased in 1928 at a cost of $52,041.94 the petitioner received from the receivers during 1934 and 1935 several distributions totaling $18,750. During the taxable year 1936 it received two distributions totaling $12,375; and subsequent to 1936 it received $312.50 on July 1, 1938, and $292.50 on December 23, 1940, as distributions made by the receivers, as above stated, on June 30, 1938, and December 20, 1940. No further distributions have been received by petitioner.

For the year 1936 the petitioner claimed and the respondent disallowed a deduction of a loss, in the amount of $20,916.94, representing the difference between the cost of the storm drain bonds to petitioner and the total amount of distributions to it on account thereof up to the end of the year 1936.

Petitioner's bonds did not become worthless during 1936. Neither were they ascertained to be worthless and charged off during that year.

OPINION ON THIRD ISSUE.

The third issue herein involves the question of whether the petitioner sustained, in 1936, a deductible loss òf $20,916.94, representing the uncollected balance in 1936 of the cost of petitioner's Southfield Storm Sewer Drain District bonds alleged to have become worthless in that year. This issue presents a question of fact.

The petitioner contends that such bonds became "substantially" worthless in 1936 following the last of two distributions made in that year by the receivers on account of such bonds.

The facts herein do not establish worthlessness in 1936 of the unrecovered cost of petitioner's bonds and we have so found in our findings of fact. At the close of 1936 the receivers had on hand assets consisting of $5,035.62 in cash, subject to payment of undisclosed expenses, the sum of $24,388 impounded in a closed bank, and the right to receive payment of $497,690.68, or some agreed lesser amount if approved by the court, if the completed portion of the storm drain should at any future date be incorporated with any other drain or sewer. There is no evidence as to what expenses had been incurred up to the close of 1936 and would have to be paid out of the cash on hand and no evidence that the impounded funds were worth less than face value at the close of 1936. As to the receivers' rights in the future use of the completed portions of the storm drain, the testimony merely tends to show that they were probably of doubtful value at the close of 1936, but this record fails to establish that such rights were actually worthless at that time.

Upon failure of proof, we hold that petitioner is not entitled to the claimed loss deduction of $20,916.94 for 1936 and the respondent's determination is sustained on this issue.

On this issue the pleadings raised no question as to the claimed deduction of $20,916.94 being based on a bad debt and, on brief, petitioner makes no such contention. However, had such deduction been claimed on the ground that it was a bad debt it would not be allowable, because of failure to prove an ascertainment of worthlessness and a charge-off of the loss by petitioner on the Southfield Storm Sewer Drain District bonds during 1936.

*Decision will be entered pursuant to Rule 50.*