PUTOMA CORPORATION, SUCCESSOR BY MERGER OF PRO-MAC COMPANY, ET AL., [1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7468-73—7472-73.    Filed June 30, 1976.

*Richard Lee Brown,* for the petitioners.
*David L. Jordan,* for the respondent.

WILBUR, *Judge:* Respondent has determined the following deficiencies in petitioners' Federal income tax:

| Docket No. | Petitioner(s) | Taxable period | Deficiency |
|---|---|---|---|
| 7468-73 | Putoma Corp., successor by merger of Pro-Mac Co. _____ | FY 7/31/67 | $7,808.88 |
| | | FY 7/31/68 | 62,274.65 |
| | | FY 7/31/69 | 38,233.57 |
| | | FY 7/31/71 | 11,612.39 |
| 7469-73 | Lee Roy Purselley and Georgia Purselley _____ | 1969 | 4,094.02 |
| 7470-73 | Putoma Corp. _____ | FY 6/30/66 | 17,387.01 |
| | | FY 6/30/67 | 11,667.40 |
| | | FY 6/30/68 | 166,075.24 |
| | | 7/1-12/31/70 | 13,016.76 |
| 7471-73 | J. M. Hunt and Inez Hunt _____ | 1970 | 83,728.45 |
| 7472-73 | Lee Roy Purselley _____ | 1970 | 92,580.12 |

[1] The cases of the following petitioners are consolidated herewith: Lee Roy Purselley and Georgia Purselley, docket No. 7469-73; Putoma Corporation, docket No. 7470-73; J. M. and Inez Hunt, docket No. 7471-73; and Lee Roy Purselley, docket No. 7472-73.

Certain concessions having been made by the parties, the following issues remain for our decision:

(1) Whether petitioners, Putoma Corp. (hereinafter referred to as Putoma), and Putoma Corp., successor by merger of Pro-Mac (hereinafter referred to as Pro-Mac), are entitled to deduct compensation to shareholder-employees which was accrued but not paid in the years at issue.

(2) Whether the cancellations by stockholders, Lee Roy Purselley and J. M. Hunt, of indebtedness for accrued compensation, interest, and commissions resulted in the realization of taxable income, either by such individuals or by the corporations.

(3) Whether Pro-Mac is entitled to deduct a $6,000 commission payable to J. M. Hunt for its fiscal year ending July 31, 1968.

(4) Whether a bad debt deduction claimed by petitioners J. M. Hunt and Inez Hunt, for calendar year 1970, arising from loans to Jet Air Machine Corp. was a business or nonbusiness bad debt.

### FINDINGS OF FACT

During the years in issue, the individual petitioners were residents of Texas and filed their respective returns with the Director, Internal Revenue Service Center, Austin, Tex. At all times pertinent to this case Putoma Corp. and Pro-Mac Co. were Texas corporations each having their principal offices and places of business located in Fort Worth, Tex. Putoma is on the accrual basis of accounting and filed its corporate income tax returns for fiscal years ended June 30, 1966, and June 30, 1967, with the District Director of Internal Revenue, Dallas, Tex., and its corporate income tax returns for fiscal years ended June 30, 1968, June 30, 1969, and taxable period July 1, 1970, to December 31, 1970, with the Director, Internal Revenue Service Center, Austin, Tex. Pro-Mac is also an accrual basis taxpayer and filed its corporate income tax returns for the taxable year ended July 31, 1967, with the District Director of Internal Revenue, Dallas, Tex., and its corporate income tax returns for the taxable years ended July 31, 1968, July 31, 1969, July 31, 1970, and July 31, 1971, with the Director, Internal Revenue Service Center, Austin, Tex.

During the years in issue Purselley and Hunt each owned 50 percent of the stock in Putoma and Pro-Mac. Putoma was

organized on July 15, 1963, with Purselley serving as president and Hunt as treasurer. The board of directors consisted of Purselley, Hunt, and Harold Wright, Putoma's accountant. On July 19, 1969, Hunt resigned as officer and director of Putoma and Wilson E. Guest was elected as director.

At a meeting of Putoma's directors held in July 1964, the salary of Purselley was fixed at $600 per month, retroactive from July 1, 1963. This salary was not to be paid, but to accrue to his credit until such time as in the judgment of the majority of directors the earnings of the corporation justified the payment of the salary. Purselley was also given as part of his compensation, 25 percent of the net profits. Compensation from July 1, 1964, was to be determined at a future meeting.

The minutes for the board of directors meeting for Putoma held on August 23, 1965, contain the following statement relating to salary:

Upon motion duly made and seconded, the salary of Lee Roy Purselley for the current year was fixed at $2,000.00 per month plus 25% of the net profit of the corporation after deduction of the $2,000.00 monthly salary, but before deduction for any bonus or Federal income taxes. This salary is to be retroactive from July 1, 1965. Such salary in excess of the $2,000.00 per month is not to be paid but to accrue to his credit until such time as in the judgement of the majority of the directors of the company, the company has such cash reserve in order to pay the additional salary.

Upon further motion duly made and seconded, the salary of J.M. Hunt was established at 10% of the net income of the company before the deduction of any bonus or Federal income taxes. This salary is to be retroactive from July 1, 1965. Such salary is not to be paid, but to accrue to his credit until such time as in the judgement of the majority of the directors of the company, the company has sufficient cash reserve in order to pay the salary.

The compensation formula set out above remained unchanged until January 1, 1970. At a meeting of Putoma's directors held on December 10, 1969, bonuses for Purselley and Hunt were discontinued as of December 31, 1969, and Purselley's salary was set at $3,000 per month beginning January 1, 1970.

The following schedule shows salary and bonus accruals, and cash payments for Purselley and Hunt recorded on Putoma's books for fiscal years ended June 30, 1964, through calendar year December 31, 1971:

### LEE ROY PURSELLEY

| Period ended | Accrued amounts | | Cash |
| | Yearly salary | Yearly bonus | payments |
| --- | --- | --- | --- |
| 6/30/64 _____ | $7,200 | $2,763.64 | - - - |
| 6/30/65 _____ | 7,200 | 2,791.59 | $10,335.94 |
| 6/30/66 _____ | 24,000 | 21,408.42 | 11,210.00 |
| 6/30/67 _____ | 24,000 | 45,115.41 | 29,909.32 |
| 6/30/68 _____ | 24,000 | 85,324.03 | 38,004.57 |
| 6/30/69 _____ | 24,000 | 43,833.66 | 33,269.86 |
| 6/30/70 _____ | 30,000 | - - - | 25,480.44 |
| 12/31/70 _____ | 18,000 | - - - | 14,000.00 |
| 12/31/71 _____ | - - - | - - - | 15,473.75 |
| | 158,400 | 201,236.75 | 177,683.88 |

### J.M. HUNT

| | | | |
| --- | --- | --- | --- |
| 6/30/64 _____ | - - - | - - - | - - - |
| 6/30/65 _____ | - - - | - - - | - - - |
| 6/30/66 _____ | - - - | $8,563.87 | - - - |
| 6/30/67 _____ | - - - | 6,711.92 | - - - |
| 6/30/68 _____ | - - - | 34,129.61 | - - - |
| 6/30/69 _____ | - - - | 17,533.46 | - - - |
| 6/30/70 _____ | - - - | - - - | - - - |
| 12/31/70 _____ | - - - | - - - | - - - |
| 12/31/71 _____ | - - - | - - - | - - - |
| | - - - | 66,938.86 | - - - |

The $43,833.66 bonus accrual for Purselley for fiscal 1969, and the $17,533.46 bonus accrual for Hunt for fiscal 1969 (both set out above) were recorded on Putoma's books on February 28, 1970, and April 30, 1970. Putoma's bookkeeper was not a "full charge" bookkeeper, and her entries had to be adjusted by the C.P.A. (Mr. Wright or his assistant) with ultimate responsibility for Putoma's (and Pro-Mac's) books. Mr. Wright died at the end of December 1969 and delays were encountered as a result of Mr. Wright's practice changing hands.

Pro-Mac was formed on December 1, 1966. During the years before the Court, Pro-Mac was owned 50 percent by Purselley and 50 percent by Hunt. From December 1, 1966, until July 19, 1969, Purselley was president and Hunt was secretary-treasurer. Pro-Mac's board of directors consisted of Hunt, Purselley, and a nonowner employee, H.L. Farquhar, who was also vice president. Mr. Farquhar had no real say as to how the company was operated.

Article V, section 4 of Pro-Mac's bylaws provides that the salaries of corporate officers are to be fixed by the board of directors. The minutes of the organizational meeting of Pro-Mac's board, however, reflect no discussion of officer

compensation. Furthermore, there are no board of directors minutes for Pro-Mac during the period November 30, 1966, through July 18, 1969. Nevertheless, the books and records of Pro-Mac consistently reflect the accrual of a salary of $1,000 per month for both Hunt and Purselley, and the accrual of a bonus of 25 percent of profits for Purselley and 10 percent of profits for Hunt. The salaries and bonuses accrued for Purselley and Hunt by Pro-Mac were not payable until Pro-Mac's earnings were sufficient to permit payment.

The first minutes to discuss the Pro-Mac compensation plan were those of a directors meeting held December 10, 1969. At that time, it was decided to discontinue the bonuses for Purselley and Hunt and to fix Purselley's salary at $1,000 per month commencing January 1, 1970. At a subsequent meeting held August 27, 1970, a $1,000-per-month salary was also voted for Hunt, retroactive to January 1, 1970. Due to the low cash condition of the corporation, Hunt's salary was to be accrued in his accrued-salary account until a later date when the corporation was "financially able."

The following schedule shows salary and bonus accruals, and cash payments for Purselley and Hunt recorded on Pro-Mac's books for fiscal years ended July 31, 1967, through August 31, 1971.

LEE ROY PURSELLEY

| Period ended | Accrued amounts | | Cash payments |
|---|---|---|---|
| | Yearly salary | Yearly bonus | |
| 7/31/67 | $8,000 | $9,366.11 | - - - |
| 7/31/68 | 12,000 | 27,466.04 | - - - |
| 7/31/69 | 12,000 | 14,575.63 | $30,097.54 |
| 7/31/70 | 12,000 | 4,753.85 | - - - |
| 7/31/71 | 5,000 | - - - | - - - |
| 8/31/71 | - - - | - - - | - - - |
| | 49,000 | 56,161.63 | 30,097.54 |

J. M. HUNT

| Period ended | Accrued amounts | | Cash payments |
|---|---|---|---|
| | Yearly salary | Yearly bonus | |
| 7/31/67 | $8,000 | $3,746.44 | - - - |
| 7/31/68 | 12,000 | 10,986.41 | - - - |
| 7/31/69 | 12,000 | 5,830.25 | $30,097.54 |
| 7/31/70 | 12,000 | 1,208.20 | - - - |
| 7/31/71 | - - - | - - - | - - - |
| 8/31/71 | - - - | - - - | - - - |
| | 44,000 | 21,771.30 | 30,097.54 |

The $30,097.54 cash payment for Purselley and Hunt arose as a result of a series of transactions. On January 1, 1968, Purselley and Hunt withdrew $38,144.30 ($19,072.15 each) from Pro-Mac in order to purchase some land. The withdrawals were charged to loans receivable by Pro-Mac's bookkeeper on January 31, 1968. In July 1968 Purselley's and Hunt's loans receivable accounts were charged with $750 each by journal entry to reclassify payments out of Pro-Mac on November 27, 1967. At this point the loans receivable accounts showed a balance of $19,822.15 for Purselley and Hunt. On December 31, 1968, the following journal entries [2] were made on the books of Pro-Mac:

| | |
|---|---|
| Accrued salary—Purselley _____ | $30,097.54 |
| Accrued salary—Hunt _____ | 30,097.54 |
| Loan receivable—Purselley _____ | 19,822.15 |
| Loan receivable—Hunt _____ | 19,822.15 |
| Accrued withholding taxes_____ | 19,854.38 |
| Accrued FICA taxes _____ | 686.40 |

To treat the loans to Purselley and Hunt as salary, the salaries reported fourth quarter, December 31, 1968, payroll tax returns.

Hunt and Purselley treated the amounts originally recorded as loans as salary and reported this income on their individual tax returns for 1968. Pro-Mac reported these payments as salaries on payroll tax returns for the fourth quarter of 1968. The net effect of these transactions, although originally recorded as loans, was to render payments on account of petitioners' salaries in fiscal 1969.

Putoma Corp. and Pro-Mac Co. were engaged in the business of making complex structural aircraft parts for the F-111 airplanes being built by General Dynamics. Pro-Mac developed and built the machinery to manufacture those parts. Since its formation Putoma experienced a steady and substantial upturn in business. Pro-Mac also enjoyed increasingly higher sales. The profits of the business were almost completely used to finance internal growth. The aim of Hunt and Purselley was to develop to the stage where they could effectively handle the expected requirements of the F-111 program. At that point, it was anticipated that the business growth would stabilize and that the outstanding compensation would be paid. Hunt and Purselley made a conservative estimate of the number of F-111's that they felt would ultimately be

---

[2] These entries were stipulated by the parties.

produced. They were, however, unable to foresee just how drastic the cutbacks in the F-111 program would be. By the middle of calendar year 1969, it became clear that the F-111 program would be sharply curtailed. As a result, Putoma and Pro-Mac suffered severe declines in their sales.

At a meeting of Putoma's board of directors on July 9, 1970, a discussion was held concerning the current financial condition of the corporation. It was agreed that in order to reflect a better financial condition to creditors and potential lenders, Hunt and Purselley would be asked to forgive a portion of the moneys owed them by the corporation. Substantially the same decision was made by Pro-Mac's board of directors in a meeting held the same day.

On September 15, 1970, Purselley and Hunt forgave the following accrued items owed to them according to the books and records of Putoma and Pro-Mac:

|  | Putoma | Pro-Mac |
|---|---|---|
| Lee Roy Purselley—accrued salary _____ | $89,109.06 | $44,453.50 |
| Hunt—accrued salary _____ | 66,938.36 | · 35,673.76 |
| Hunt—accrued interest _____ | 22,170.70 | 2,779.74 |
| Hunt—accrued commission _____ | - - - | 6,000.00 |
| Total_____ | 178,218.12 | 88,907.00 |

On September 15, 1970, Purselley's accrued payroll account on Putoma's books and records showed a balance of $194,626.32, before forgiveness, and $106,017.26 after forgiveness. Hunt's accrued payroll account on Putoma's books and records showed a balance of $66,938.36 before forgiveness and $0 after forgiveness.

On September 15, 1970, Purselley's accrued payroll balance on Pro-Mac's books showed a balance of $72,064.09 before forgiveness and $27,610.59 after forgiveness. Hunt's accrued payroll account on Pro-Mac's books showed a balance of $37,673.76 before forgiveness and $2,000 after forgiveness.

The debt to Hunt for accrued interest arose out of his practice of buying machinery and selling it to the two corporations for the same price. Instead of receiving cash for each machine, Hunt would receive an interest-bearing note and a chattel mortgage. The security interests Hunt received in the machines were filed of record in the appropriate county office.

The $6,000 sales commission accrued by Pro-Mac and forgiven by Hunt resulted from a sale by Hunt of two Pro-Mac machines to Glover-Hunt Corp. on July 15, 1968. Hunt owned 49 percent

of the stock of Glover-Hunt at the time of the sale. Glover owned the other 51 percent. The commission was not recorded for the fiscal year ending July 31, 1968. The commission was recorded on the books of Pro-Mac as of July 31, 1970, pursuant to authority in a letter from Purselley to Pro-Mac's comptroller dated October 9, 1970. Hunt did not receive any other commissions from Pro-Mac or Putoma during the years here involved. Petitioners now concede that the commission is not properly accruable in 1970 but argue for its accrual in Pro-Mac's 1968 return.

In addition to his respective interests in Glover-Hunt, Putoma, and Pro-Mac, Hunt owned 25 percent of Jet Air Machine Corp. (Jet Air), a corporation formed in 1968. Hunt's basis in the Jet Air stock was $1,500. The other stock was owned 50 percent by N. L. Franklin and 25 percent by Purselley. Hunt was also a director of Jet Air.

In 1970, Jet Air became financially distressed and Hunt loaned the corporation $44,257.99. Hunt was an expert machinist and shop manager with 28 years of experience, and he wanted to become shop superintendent to revamp procedures to trim costs and to increase efficiency. Hunt agreed with N. L. Franklin, president of Jet Air, that in return for making the loans, Hunt would join the corporation as shop superintendent. It was further agreed that until the corporation began turning a profit, Hunt would draw no salary. Once the corporation was on a sound financial basis Hunt's salary would be paid retroactively. This loan was secured by liens on certain Jet Air assets.

Shortly after the loan was made, Jet Air filed in bankruptcy. Hunt acquired certain items under his lien and others were sold at public auction. He was unable, however, to recover the full proceeds of the loan. The net amount of Hunt's loss was $16,471.

Hunt had previously loaned money to Glover-Hunt Corp., and to two individuals with whom either Hunt or corporations he invested in had business relationships.

OPINION

*Issue 1. Deductions for Accrued Compensation*

The first question we are called upon to decide is whether Putoma and Pro-Mac as accrual basis taxpayers are entitled to deduct accrued but unpaid compensation credited to Hunt and

Purselley. The method of accounting utilized by the taxpayer is determinative of the proper year in which a deduction may be taken. Sec. 461.[3] Under the accrual method of accounting, an expense is deductible in the taxable year in which all the events have occurred which determine the fact of the taxpayer's liability and the amount thereof can be determined with reasonable accuracy. *United States v. Anderson,* 269 U.S. 422 (1926). Sec. 1.446-1(c)(1)(ii),[4] Income Tax Regs.

In order to be accruable, a liability must be binding and enforceable; must not be contingent on a future event; the amount of the liability must be certain; and there must be a reasonable belief on the part of the debtor that the liability will be paid. *United Control Corp.,* 38 T.C. 957, 967 (1962).[5] Respondent contends that the obligation for the accrued but unpaid salaries before us was contingent on the existence of sufficient cash reserves by petitioner corporations, requiring a determination by the parties involved on the basis of vague and subjective criteria at some future date. Conversely, petitioner contends that the obligation established by the resolution was absolute, and that only payment of the obligation was deferred to a future date. While hardly free from doubt, we agree with respondent.

The critical language is found in the following minutes of Putoma Corp. for August 27, 1965:

> Upon motion duly made and seconded, the salary of Lee Roy Purselley for the current year was fixed at $2,000.00 per month plus 25% of the net profit of the corporation after deduction of the $2,000.00 monthly salary, but before deduction for any bonus or Federal income taxes. This salary is to be retroactive from July 1, 1965. Such salary in excess of the $2,000.00 per month is not to be paid but to accrue to his credit until such time as in the judgement of the majority of the directors of the company, the company has such cash reserve in order to pay the additional salary.

---

[3] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

[4] The limitation on deductibility for unpaid expenses provided for in sec. 267(a)(2) is inapplicable here. Sec. 267(b)(2) requires that an individual own *more than* 50 percent of the value of outstanding corporate stock in order for the corporation and the individual to be related persons within the meaning of sec. 267. Hunt and Purselley each owned 50 percent of Putoma and Pro-Mac.

[5] Respondent apparently does not contend that the accrued bonuses could not be determined with reasonable accuracy. He could hardly contend otherwise, since the amounts accrued resulted from a mechanical computation based on net profits readily ascertainable at the end of each year. The stipulated bonus figures (with the exception of 1970 for Pro-Mac) correspond with the income figures on the returns stipulated for Putoma and Pro-Mac.

Although there are no Pro-Mac minutes reflecting decisions on officers' compensation until January 1, 1970, Purselley testified that all the terms and conditions applicable to Putoma's compensation plan were carried over to Pro-Mac, and that the Pro-Mac bonuses were not payable until earnings were sufficient to permit payment. In August of 1970, after Pro-Mac discontinued the bonuses, a salary of $1,000 per month (retroactive to January 1, 1970) was voted for Hunt; the salary was to be accrued and paid at a later date when the corporation was "financially able."

Under Texas law, a contract to pay when the debtor is able (or similar language) represents a conditional obligation. In *Burlington-Rock Island Railroad Co. v. United States,* 321 F.2d 817 (5th Cir. 1963), a railroad corporation attempted to deduct accrued but unpaid interest on its debt to its shareholder creditors. Both the District Court and the Fifth Circuit Court of Appeals disallowed the deduction. The Fifth Circuit's opinion was based on the following reasoning:

> Under the terms of the Allocation Agreement, Burlington was required to make payments "from time to time, insofar as its cash situation will reasonably permit." Such a contract under Texas law would impose merely a conditional obligation on the debtor to pay, and he would be under no legal duty to make payments unless his financial situation permitted it. Thus a creditor could enforce such an obligation only by showing that the promissor has sufficient funds to make payment. See Brickley v. Finley, Tex. Civ. App. 1940, 143 S.W. 2d 433; Wright v. Farmer's Nat. Bank, 1903, 31 Tex. Civ. App. 406, 72 S.W. 103, and the cases cited therein. Cf., Worth Petroleum Co. v. Callihan, Tex. Civ. App. 1935, 82 S.W. 2d 1060. Burlington's duty to pay the statutory interest was thus contingent upon its financial situation, and no legal obligation could arise under the agreement until the occurrence of that contingency.[6]

This accords with the general rule underlying several opinions of this Court disallowing a deduction for the accrual of compensation which is subject to one or more conditions before liability for payment becomes firmly established. *Field & Start, Inc.,* 17 B.T.A. 1206, 1212 (1929), affd. per curiam 44 F.2d 1014 (2d Cir. 1930) (when "borrowed capital shall no longer be required for corporation business"); *E.B. & A.C. Whiting Co.,* 10 T.C. 102, 118 (1948) ("that said bonus should be paid at such time as in

---

6 Admittedly, the facts in the *Burlington-Rock Island Railroad* case are extreme. But the governing language involved is quite similar (payments "insofar as its cash situation will reasonably permit") to the language we confront and the opinion of the Fifth Circuit is clear.

the discretion of the treasurer finances of the corporations will permit"); *Ames Reliable Products Co.,* 44 B.T.A. 176, (1941) (bonus to be paid "when all outstanding bonds have been retired and the cash position of the company warrants").[7]

Petitioners place particular reliance on our decision in *United Control Corp.,* 38 T.C. 957 (1962). In that case an accrual basis taxpayer had a credit agreement with a bank which limited the amount of salary the corporation could pay to its officers. This Court allowed the accrual and deduction of salaries in excess of the limitations under the agreement. We believe that *United Control Corp.* is distinguishable from this case. The agreement in *United Control Corp.* only prohibited the *payout* of salaries in excess of the stated amount; the Court there found nothing in the agreement to prohibit the taxpayer from authorizing and incurring an indebtedness beyond those limitations. In fact, the excess amounts in that case were fully authorized and the obligation for payment firmly established. Furthermore, we noted there: "No consent or condition was provided for by the board before such authorization would become a binding commitment upon petitioner." *United Control Corp., supra* at 969.

In addition to *United Control Corp.,* petitioner relies on Perkins Land & Lumber Co., 9 B.T.A. 528 (1927), and *Clark v. Woodward Construction Co.,* 179 F.2d 176 (10th Cir. 1950). We are confronted with an issue resting heavily on the particular facts of each case. While these cases are similar to the one before us, in both cases the court found that corporate action was taken during the taxable years in issue fixing a definite corporate obligation to pay the additional compensation, and the court found that only the time of payment was deferred. Thus, the court in *Woodward Construction Co.* stated that "All that was done was to give the taxpayer an extension of time within which to discharge this accrued and fixed liability."

It is true, as stated in *Wisznia v. Wilcox,* Tex. Civ. App. 1969, 438 S.W. 2d 874, 876, that:

---

[7] "Of course, an action by a director to recover his salary is premature until conditions have been complied with upon which his right to compensation was predicated. And to warrant a recovery based on a resolution giving the manager of a corporation a salary payable only 'when the finances of the company will warrant so doing,' it must be shown that when the action was brought the finances of the company warranted payment. [Fn. refs. omitted. 5 Fletcher Cyc. Corp., sec. 2155, p. 651 (rev. ed. 1967).]" See also *Thomas v. American Radio & Television,* 228 Ark. 1050, 312 S.W. 2d 183 (1958). (Payment "when the company is in a position to do so, the time to be decided at a later date," creates a conditional promise to pay.)

If the parties intend that the debt shall be absolute, and fix upon a future event merely as a convenient time for payment, the debt will not be contingent, and if the future event does not happen as contemplated, the law will require payment to be made within a reasonable time. Williston on Contracts, Third Edition, Vol. 5, sec. 799.

The cases petitioner relies on fall within this principle. However, we believe that in the instant case, the obligation was contingent on a finding by the board of directors of petitioner corporations (that is, the obligees and individual petitioners here involved) at some future time that the finances of the corporation permitted payment.[8]

### Issue 2. Cancellation of Indebtedness for Accrued Interest

Hunt sold machinery to both Putoma and Pro-Mac for his cost, taking back an interest-bearing note and a chattel mortgage. In September of 1970, Hunt canceled the indebtedness for accrued interest of Putoma ($22,170) and Pro-Mac ($2,779.74). Respondent contends that these events result in cancellation of indebtedness income to the corporations, or alternatively result in income to petitioner Hunt because he exercised his right to forgive the indebtedness owed him by the corporations.[9]

We deal with the cancellation of indebtedness income issue first. Focusing on this issue, the facts present an interesting problem arising from the convergence of two distinct rules of income inclusion—cancellation of indebtedness income and the tax benefit rule; and one rule of income exclusion—"gratuitous" contributions to capital. Due more to history than logic, when these rules have been applied to facts similar to those before us, the tax benefit rule has disappeared under the canopy of the cancellation of indebtedness rule, and the cancellation of indebtedness rule has disappeared under the canopy of the contributions to capital rule. In the end, only the income exclusion principle is left standing.

---

[8] Respondent makes the further argument that the salaries and bonuses accrued by Pro-Mac were not deductible because they were never formally authorized. Since we have found that all of the unpaid but accrued salaries and bonuses of Pro-Mac were conditional on financial ability and therefore nonaccruable, we do not reach this issue.

[9] This was an alternative position with regard to the canceled obligations for salary and interest that respondent challenged as contingent and nonaccruable, and also for the commission for Hunt. Since we have held there was no fixed liability for these salaries and commission (as to the commission, see infra), respondent's alternative position is confined to the interest obligation canceled by Hunt.

To determine how we arrived at this turn of events, we begin our discussion with the two income inclusion rules, focusing first on the tax benefit rule. "The most common, and most nearly accurate, explanation of the tax benefit rule is that it recognizes the 'recovery' in the current year of taxable income earned in an earlier year but offset by the item deducted." *Estate of David B. Munter,* 63 T.C. 663, 678 (1975) (Tannenwald, *J.,* concurring). The rule consists of three elements: (1) An amount previously deducted, (2) which resulted in a tax benefit, and (3) which was recovered during the taxable year in issue. *Estate of David B. Munter, supra* at 679.[10]

At first glance it is hard to conceive of facts falling more clearly within the tax benefit rule. Petitioner corporations have deducted accrued interest over a period of years; the deductions resulted in a tax benefit; and the liability has been recovered through cancellation. All the elements are clearly present; the net effect of these transactions is to increase corporate income by the prior tax benefit; and the appropriate correction would appear to require inclusion of the canceled interest in income. We must, however, defer this apparently obvious conclusion pending consideration of the second income inclusion rule—cancellation of indebtedness income.

That the obligation for accrued interest was canceled is not disputed. It is well established that where an individual incurs indebtedness to acquire cash or property, cancellation of indebtedness income will be realized upon the discharge of this indebtedness for less than full value. *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931); *Helvering v. American Chicle Co.,* 291 U.S. 426 (1934). Sec. 61(a)(12). This rule is also applicable to the acquisition of intangibles, that is, where the debt is incurred for rent for the use of property *(Haden Co. v. Commissioner,* 118 F.2d 285 (5th Cir. 1941)), is for interest for

---

[10] The tax benefit rule is both a rule of inclusion and exclusion: recovery of an item previously deducted must be *included* in income; that portion of the recovery not resulting in a prior tax benefit is *excluded.* The rule in both aspects evolved judicially and administratively. The rule has been codified as to certain items in sec. 111. While focusing on the second aspect (exclusion), sec. 111 is predicated on the validity of the first aspect (inclusion). Although the rule has been partly absorbed in the statute, it has been expressly stated that the unabsorbed portion of the rule continues to apply. *Dobson v. Commissioner,* 320 U.S. 489, 506 (1943); *Alice Phelan Sullivan Corp. v. United States,* 381 F.2d 399 (Ct. Cl. 1967); *Capitol Coal Corp.,* 26 T.C. 1183 (1956), affd. 250 F.2d 361 (2d Cir. 1957); *Mayfair Minerals, Inc.,* 56 T.C. 82 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972); *Birmingham Terminal Co.,* 17 T.C. 1011 (1951). Sec. 1.111-1(a), Income Tax Regs.

the use of money *(Helvering v. Jane Holding Corp.,* 109 F.2d 933 (8th Cir. 1940)), or is on an open account for the purchase of business inventory *(Marshall Drug Co. v. United States,* 95 F.Supp. 820 (Ct. Cl. 1951); *Capitol Coal Co.,* 250 F.2d 361 (2d Cir. 1957), affg. 26 T.C. 1183 (1956)). Assuming the debt cancellation is not a reduction in the acquisition price, the realization of income may be viewed as resembling a short sale, "a telescoping of gain into one year from a transaction which probably extended over a span of many years." [11]

Enter here our third rule, the rule of income exclusion arising from "gratuitous" contributions to capital. A stockholder who transfers money or property to his corporation without consideration has made a contribution to capital; if the money or property is originally transferred as a loan, the cancellation of the corporate obligation to pay (when the events are telescoped) also results in a contribution to capital rather than cancellation of indebtedness income. In this situation the second income inclusion principle disappears.

But where unpaid interest has also been accrued and deducted on the loan, the disappearance of the cancellation of indebtedness rule should not automatically cause the tax benefit rule, a distinctly different principle, to also vanish. That rule, designed to specifically apply to the recovered interest, would appear to be left standing squarely in place, raising the question of whether the tax benefit rule overrides any policy underlying section 118 (contributions to capital).[12]

---

[11] Eustice, "Cancellation of Indebtedness and the Federal Income Tax," 14 Tax L. Rev. 225, 230 (1959) (hereafter Eustice). But where cash is not the asset acquired and the asset acquired has declined sharply in value and has not been disposed of, the short "sale" theory encounters difficulty. See, as typical, *Helvering v. A.L. Killian Co.,* 128 F.2d 433 (8th Cir. 1942), and *Hirsch v. Commissioner,* 115 F.2d 656 (7th Cir. 1940), suggesting cancellation was like a reduction in purchase price reducing a loss on the asset held. Taxpayers may avoid cancellation of indebtedness income under certain circumstances by making a timely election to reduce the basis of property they hold. See secs. 108 and 1017.

[12] This is a problem the courts have faced in other contexts. See *Commissioner v. Anders,* 414 F.2d 1283 (10th Cir. 1969); *Spitalny v. United States,* 430 F.2d 195 (9th Cir. 1970); *Estate of David B. Munter,* 63 T.C. 663 (1975); *Tennessee Carolina Transportation, Inc.,* 65 T.C. 440 (1975). It is difficult to believe that Congress, in enacting sec. 118, thought of the tax saved by a prior deduction as a contribution to capital. If a locality cancels accrued taxes in order to maintain the economic viability of a business critical to the local economy, sec. 118 was specifically designed to be applicable. H. Rept. No. 1337, 83d Cong., 2d Sess. 17 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess. 18, 19 (1954). Yet it is also clear that sec. 111 applies, as "The term 'recovery of a tax' includes * * * the *cancellation* of a purported tax liability which was accrued and deducted for a prior taxable year." S. Rept. No. 1631, 77th Cong., 2d Sess. 80 (1942), 1942-2 C.B. 504, 565. (Emphasis added.) As noted (see n. 10 *supra)* the judicial tax benefit rule continues to apply to items (such as interest) not absorbed in sec. 111. If, as the legislative history makes clear, sec. 111 invokes

Yet it has been consistently held that *both* income inclusion principles disappear under the contribution to capital canopy. In this we may be confronted with still another instance where "a page of history is worth a volume of logic." Respondent early issued cancellation of indebtedness regulations holding that any cancellation by shareholders of a corporate debt is a contribution to capital.[13] He nevertheless argued, with mixed results, that the cancellation was a contribution to capital only to the extent of principal, and did not include cancellation of previously deducted items resulting in a tax benefit. *Commissioner v. Auto Strop Safety Razor Co.,* 74 F.2d 226 (2d Cir. 1934), and *Carroll-McCreary Co. v. Commissioner,* 124 F.2d 303 (2d Cir. 1941) (both rejecting the argument); *Helvering v. Jane Holding Corp.,* 109 F.2d 933 (8th Cir. 1940), *Howard Paper Co.,* 43 B.T.A. 545 (1941), and *Beacon Auto Stores, Inc.,* 42 B.T.A. 703 (1940) (agreeing with the argument).

*Helvering v. American Dental Co.,* 318 U.S. 322 (1943), involving previously deducted rent as well as interest on trade accounts, proved a mortal blow to respondent's theory. The Supreme Court held that the cancellations, being without consideration, were nontaxable gifts. While not discussing the tax benefit rule, the Supreme Court observed that the canceled indebtedness "had served to offset income in like amount in prior years" *(Helvering v. American Dental Co., supra* at 324), and *Commissioner v. Auto Strop Safety Razor Co.,*[14] *supra,* was cited with implicit approval. Additionally, there was some discussion of the tax benefit aspects in the lower courts,[15] and the point was

---

the judicial recovery rule to tax recovery (cancellation) of prior taxes, the same judicial recovery rule would appear to tax the recovery (cancellation) of prior interest. It certainly makes no difference that in one instance the *limitation* portion of the rule has been codified, and in the other instance it continues to be judicially derived.

Additionally, the recovery rule has been applied to recoveries that would otherwise be a tax-free return of capital. *Griffiths v. Commissioner,* 308 U.S. 355 (1939) (without tax benefit limitation); *Dobson v. Commissioner,* 320 U.S. 489 (1943) (with tax benefit limitation); *Alice Phelan Sullivan Corp. v. United States,* 381 F.2d 399 (Ct. Cl. 1967) (with tax benefit limitation). It would appear equally applicable to recoveries that would otherwise be a tax-free contribution to capital. But as will be made clear, such is not the case.

[13] Regs. 69, art. 49 (1926).

[14] Although *Commissioner v. Auto Strop Safety Razor Co.,* 74 F.2d 226 (2d Cir. 1934), did not involve a showing that the forgiven items were in fact previously deducted.

[15] See *American Dental Co.,* 44 B.T.A. 425, 428 (1941); *American Dental Co. v. Commissioner,* 128 F.2d 254, 256 (7th Cir. 1942).

argued before the Supreme Court.[16]

This Court subsequently interpreted *American Dental* to preclude taxation of the cancellation in a number of cases not fairly distinguishable from the facts we confront. *George Hall Corp.,* 2 T.C. 146 (1943); *Pancoast Hotel Co.,* 2 T.C. 362 (1943); *McConway & Torley Corp.,* 2 T.C. 593 (1943). The issue was considered well settled. See *Midland Tailors,* a Memorandum Opinion of this Court dated June 19, 1943; *Tanner Mfg. Co.,* a Memorandum Opinion of this Court dated June 19, 1943; *S. H. DeRoy & Co.,* a Memorandum Opinion of this Court dated May 9, 1944.

The definition of a gift in *American Dental* is, of course, no longer viable, as a result of *Commissioner v. Jacobson,* 336 U.S. 28 (1949).[17] But despite *Jacobson* and amendments to the cancellation of indebtedness regulations to fortify respondent's position,[18] *American Dental* has been relied on in a series of cases uniformly holding that the cancellation of accrued and deducted items does not produce income to the obligor, if the cancellations are a contribution to capital, even though the items produced a prior tax benefit. *Reynolds v. Boos,* 188 F.2d 322 (8th Cir. 1951); *Commissioner v. Fender Sales,* 338 F.2d 924, 930 (9th Cir. 1964); *Utilities & Industries Corp.,* 41 T.C. 888 (1964), revd. on other grounds sub nom. *The South Bay Corp. v. Commissioner,* 345 F.2d 698 (2d Cir. 1965); *Hartland Associates,* 54 T.C. 1580

---

[16] The Government argued in its brief before the Supreme Court:

"The gains resulting to a solvent debtor from the cancellation of past due rent and interest obligations which he had accrued and deducted in prior years from income, are taxable income in the year of cancellation. This result is required *both* by the doctrine of *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931), that the cancellation freed assets of the taxpayer for other purposes, *and* under the theory of *Maryland Casualty Co. v. United States,* 251 U.S. 342 (1920), that the cancellation effected a restoration to income of previously deducted items.

\* \* \*

"Accordingly, under *both* the doctrine of the *Kirby* case *and* the theory of the *Maryland Casualty* case, the forgiven indebtedness, *if not made as a gift* (within the meaning of section 22(b)(3) of the Revenue Act of 1936), was properly taxable in income to the debtor."

[Government's brief, pp. 5, 6, 11. Emphasis added.]

[17] See also *Commissioner v. Duberstein,* 363 U.S. 278 (1960). A contribution to capital is hardly a gift. When a shareholder makes a contribution to capital by canceling a debt, he simply converts a debt obligation to an equity interest, expecting a yield on his investment and a higher price for disposition of his stock. Cf. *Perlman v. Commissioner,* 252 F.2d 890, 892 (2d Cir. 1958). It may be gratuitous but hardly a gift proceeding from detached and disinterested generosity when the intended "beneficiary" is the donor himself.

[18] Sec. 1.61-12(a), Income Tax Regs., now states that a contribution to capital occurs "to the extent of the principal of the debt."

(1970).[19]

Respondent has argued his theory, a curious combination of cancellation of indebtedness and tax benefit principles,[20] in much the same form for the last 5 decades, and has been consistently rejected. While a theoretically correct statement might indeed have merit considered de novo, we hardly write on a clean slate. There must be some predictability and consistency in the rules governing taxation of commercial transactions, where business planning is important.[21] Respondent simply replays here an old record that is getting a bit scratchy. He might better, at this point in time, play it in a different forum.[22]

[19] Curiously, some of the cases fail to cite *Jacobson.* For example, *Reynolds v. Boos* found a gift in a business context without reference to *Jacobson,* a finding unique among post-*Jacobson* cases. See *Bradford v. Commissioner,* 233 F.2d 935 (6th Cir. 1956).

[20] Respondent's regulations and rulings have for nearly 5 decades made it clear that his hybrid theory, including the tax benefit aspects, applies only to solvent corporations (see Regs. 69, art. 49 (1926); *Commissioner v. Auto Strop Safety Razor Co., supra),* even though this anomalous use of the tax benefit rule was long ago pointed out. *Carroll-McCreary Co. v. Commissioner,* 124 F.2d 303, 305 (2d Cir. 1941). Although he apparently on occasions has seen the theories as independent (see *Haden Co. v. Commissioner,* 118 F.2d 285, 286 (5th Cir. 1941), where the Commissioner suggested he could have collected a larger deficiency under tax benefit theory *than* under cancellation of indebtedness; see also n. 16 *supra),* they have generally been merged. See sec. 1.61-12(a), Income Tax Regs., and particularly Rev. Rul. 73-408, 1973-2 C.B. 15. Part of the problem may arise from the evanescent quality of some intangible assets, requiring the freed-asset theory of cancellation of indebtedness to be shored up with a prior deduction theory. See Eustice, *supra* at 252; Warren & Sugarman, "Cancellation of Indebtedness and Its Tax Consequences: I" 40 Col. L. Rev. 1326, 1344 (1940).

The distinction as to intangibles appears economically unrealistic, since land, labor, and capital are all factors of production—the labor of the worker, the machine he runs, and materials he processes are all consumed in the income-producing process. (Wages, cost of goods sold, rent, interest, etc., are, like depreciation, incurred because they contribute to earnings.) See *Capitol Coal Corp. v. Commissioner,* 250 F.2d 361 (2d Cir. 1957) (holding tax benefit rule inapplicable but nevertheless finding cancellation of indebtedness income even though the debt was incurred to acquire quickly consumed business inventory).

Additionally, the distinction results in entirely different treatment of cash and accrual taxpayers with no rationale under cancellation of indebtedness. (When two taxpayers have the same accretion to wealth from cancellation of indebtedness, why should the full accretion be taxed to the cash basis taxpayer while the accrual basis taxpayer is taxed only to the extent of a prior tax benefit.) In any event, the exception to the rule in both areas is clearly the same:

"the courts have adopted the same exceptions to cancellation of indebtedness income under the deduction approach as they have under the asset approach. Thus, if the taxpayer is insolvent, no income results; if the cancellation is a gift *or* a contribution to capital, there is likewise no income * * * [Eustice, *supra* at 253. Emphasis added.]"

[21] We also note that the benefits of sec. 108 require a timely election and it appears that an election may no longer be timely. Sec. 1.108(a)-2, Income Tax Regs.

[22] See *Commissioner v. Fender Sales, Inc.,* 338 F.2d 924, 934 (9th Cir. 1964) (Barnes, *J.,* dissenting), affg. in part and revg. in part a Memorandum Opinion of this Court. It is interesting to note that the tax benefit cancellation of indebtedness issue was considered sufficiently settled to issue this Court's opinion in *Fender Sales* as a Memorandum Opinion. Additionally, we note that comparable provisions in the Bankruptcy Act (sec. 270, 11 U.S.C. 670) suggest that accrued unpaid interest resulting in a prior deduction was

The record has a flip side which appears to have been cut specifically to deal with the problem here presented. Respondent contends that the accrued interest was income to petitioner Hunt when he canceled the obligation in 1970, citing *Commissioner v. Fender Sales, Inc.,* 338 F.2d 924 (9th Cir. 1964), affg. in part and revg. in part a Memorandum Opinion of this Court. See Rev. Rul. 67-402, 1967-2 C.B. 135. We find that case to be distinguishable. In *Fender Sales, Inc.,* unlike the instant case, stock was received for the debt canceled, and the shares received had an agreed fair market value equal "to the liquidated obligations discharged." The issuance of stock as "a contemporaneous quid pro quo" for the cancellation was obviously an important element in the Ninth Circuit's reasoning, and the basis on which *Eisner v. Macomber,* 252 U.S. 189 (1920), was distinguished, 338 F.2d at 927. See also Rev. Rul. 67-402, *supra* at 136. While there may be disagreement about the significance appropriately attached to the issuance of stock in these circumstances, it seems clear that the issuance of stock was, in the view of the Ninth Circuit, an important part of its ratio decidendi.[23]

Nevertheless, respondent appears to imply that the issuance of stock is not a critical part of the holding in *Commissioner v. Fender Sales, Inc., supra,* and that the case really holds that the cancellation of a debt which, if collected, would represent taxable income is, in the circumstances here present, taxable income. Additionally, respondent argues that, even aside from *Fender Sales, Inc.,* Hunt is taxable on the debt canceled under the doctrine of *Helvering v. Horst,* 311 U.S. 112 (1940).[24]

Assuming *Fender Sales, Inc.,* can be so read, it stands alone in suggesting that the doctrine of *Helvering v. Horst* can be stretched to encompass the facts before us. We do not believe the doctrine possesses any such resilience, and in this regard we specifically decline to follow *Fender Sales, Inc.*

intended to be recovered through a reduction in basis rather than an immediate recapture. These complex and interrelated provisions, worked out over a period of years, provide a further reason for suggesting that respondent direct his half-century-old argument to a different forum. See Surrey, "The Revenue Act of 1939 and the Income Tax Treatment of Cancellation of Indebtedness," 49 Yale L.J. 1153 (1940).

[23] See, for example, O'Hare, "Statutory Nonrecognition of Income and the Overriding Principle of the Tax Benefit Rule in the Taxation of Corporations and Shareholders," 27 Tax L. Rev. 215, 244 n. 66 (1971-72).

[24] As noted earlier, respondent originally contended that, if the canceled salaries were properly accruable, their cancellation (along with the interest here considered) was taxable to the corporation, or alternatively to the individuals under the assignment-of-income doctrine. Since we have ruled the salaries were not properly accruable, respondent's alternative arguments remain only as to the interest canceled by petitioner Hunt.

The accrued but unpaid salaries the corporations were conditionally obligated to pay comprised the primary source of the equal amounts of indebtedness canceled by the two coequal shareholders here involved. The obligation for salaries at the time of cancellation was subordinated, the salaries could not legally be paid, and there no longer remained a reasonable basis for believing they would be paid in due course.[25] The interest canceled was a small but integral part of the total package, having been treated by the partners on a par with the salaries canceled. While unconditional and apparently not subordinated, the interest obligation was nevertheless subject to some of the same doubts concerning collectibility in view of the financial problems petitioner corporations were experiencing. It is extremely doubtful that Hunt could have borrowed against the obligation; sold the obligation; assigned the obligation in discharge of other debts or to procure goods or services of any kind. Certainly the improvement of the corporation's prospects as a result of the cancellation was more symbolic than real. We simply do not agree that the cancellation in these circumstances is the exercise of a power to dispose of income equivalent to realization.

As a practical matter, the options open to petitioners did not really include a power of disposal, but were limited to relinquishment or maintaining the status quo. Any "dominion and control" was of a very tenuous nature, and exercisable only within this narrow corridor. The course of action followed arose from and was circumscribed by the existing exigencies, and we decline to equate this "dominion and control" with the assignment of a receivable by an individual either to secure a reciprocal advantage—discharge of a debt, the supply of goods, the rendering of services, etc.—or to make a gift.[26]

Respondent nevertheless contends that this conclusion leaves us with an insoluble dilemma, since if the debtor has received a contribution to capital, the creditor must have made the contribution, and consistency requires that both parties treat it

---

[25] In mid-1969, Purselley learned that no more F-111's would be purchased. The decline in fiscal 1969 sales accelerated in 1970 resulting in substantial losses to both corporations. The cancellations occurred in September of 1970.

[26] Additionally, if the right to payment had been gratuitously assigned to a third party, it would be taxable to petitioners when and if paid. See *Helvering v. Eubank*, 311 U.S. 122 (1940). Here, respondent, relying on assignment-of-income theory, would tax Hunt—a cash basis taxpayer—on the date of the cancellation or constructive assignment, without regard to when and if paid. See also Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P.G. Lake Case," 17 Tax L. Rev. 293, 297 n. 12, 388-393 (1962).

alike. Therefore, respondent argues, since the creditor made the capital contribution, the dominion and control associated with the contribution must be equivalent to the receipt of income by the creditor.

This is a leap of logic that we cannot follow. The fact that the debtor has received a contribution of capital from the creditor does not require or indeed even suggest the conclusion that it is a taxable transaction to the creditor under assignment-of-income theory.[27] This is simply a non sequitur begging the real question of whether Hunt exercised the kind of dominion and control required to invoke the assignment-of-income doctrine. For the reasons indicated, we think not and see no reason to misapply the assignment-of-income doctrine in response to the exigencies of the present case.[28]

What we confront is not an insoluble dilemma, but an asymmetrical transaction where one taxpayer took a deduction for the payment of interest that a related taxpayer did not include in income. Rather than spinning new theories to endlessly litigate the same issue, respondent would be better advised to seek symmetry in another forum.[29]

The respondent is an ubiquitous silent partner in all commercial transactions, claiming priority for his share of the profits—often the largest single share. The other participants in commercial transactions—suppliers, lenders, investors, etc.—need

---

[27] And this is so whether or not we denominate the obligation a chose in action and whether or not the basis for the chose in action is more than, equal to, or less than the amount of the capital contribution (indeed, even if, as here, the basis in the chose in action is zero).

[28] Respondent would certainly object to an individual whose basis in the chose in action exceeded the amount of the capital contribution claiming a loss. See *Lidgerwood Mfg. Co. v. Commissioner*, 229 F.2d 241 (2d Cir. 1956). See also *W. A. Krueger Co.*, T.C. Memo. 1967-192.

[29] The result sought by respondent is clearly contrary to the result reached in *Deloss E. Daggitt*, 23 T.C. 31 (1954), albeit based on a new theory. But even aside from the endless litigation, there is danger in continually spinning new theories to relitigate the same old issues. The logic of respondent's theory would apply even if the business taxpayer were on the cash basis, and a deduction had never been taken for the accrued interest. (Contrast this with the legislative solution provided in sec. 267). For example, if a man loaned his brother money at interest that was never paid due to unforeseen financial reversals, he might, if it is within his means, be inclined to forgive both the principal and interest to avoid rendering his brother destitute. Under respondent's theory, even though both brothers are cash basis taxpayers and no deduction was taken for the interest, the forgiving brother would be taxed on the interest relinquished. Certainly, the dominion and control exercised in these cases by the obligee is not augmented or diminished in any way by the tax return of the obligor. If that were true the assignment-of-income doctrine would not depend on the exercise of a power to dispose of income, but on the varying tax treatment different obligors (not before the Court) accorded to the obligation.

to know the terms of respondent's participation. As concerns the issue before us, we regard the terms of his participation as well settled. Any new terms will have to be negotiated in a different forum.

## Issue 3. Deduction for Sales Commission

The next issue to be decided is whether Pro-Mac is entitled to deduct the $6,000 commission payable to Hunt for its fiscal year ending July 31, 1968. This commission arose as a result of a sale by Hunt, on Pro-Mac's behalf, to Glover-Hunt, Inc., a corporation in which Hunt had a 49-percent interest. The authority for crediting this commission to Hunt was contained in a letter dated October 9, 1970, from Purselley to Pro-Mac's comptroller, Dwain Pollard. The letter stated that the commission would be paid "when Pro-Mac is financially able."

On the basis of the record we find that the deduction for this commission should be disallowed. Hunt's commission was never recorded when the sale of the two machines took place. In fact, the first time that the commission appeared on any record of Pro-Mac was on September 15, 1970, when the accrual was forgiven. The authorization for the accrual, however, did not take place until October 15, 1970, almost 1 month later. The record reflects no corporate action, either formal or informal, which would indicate that any prior approval for the commission had been given. The October 15 authorization cannot create a deductible liability for an expense which has already been forgiven.

In short, petitioners have failed to carry their burden that a fixed and enforceable liability existed in 1968, or in fact at any time subsequent. Rule 142, Tax Court Rules of Practice and Procedure. Since no liability was incurred which would support a deduction, an accrual of the $6,000 commission for 1968 is improper.

## Issue 4. Bad Debt Deduction

The final issue for our consideration is whether a bad debt incurred by petitioner Hunt in 1970 was a business or nonbusiness bad debt.

The parties agree that Hunt sustained a $16,471 loss in calendar year 1970 arising from loans Hunt made to Jet Air Machine Corp. The only question in dispute is the characterization of this bad debt loss. If the bad debt was a

business bad debt, then the $16,471 is deductible in full against ordinary income. Sec. 166(a)(1). On the other hand, if the bad debt was not a business bad debt, then the loss must be treated as a short term capital loss subject to the limitations of section 1211. Sec. 166(d).[30] In order to qualify for the business bad debt deduction, petitioner must show that he was engaged in a trade or business and that the bad debt was proximately related to it. Sec. 1.166-5(b), Income Tax Regs.

It is now well established that being an employee may be a trade or business for the purposes of section 166. *Trent v. Commissioner,* 291 F.2d 669 (2d Cir. 1961), cf. *David J. Primuth,* 54 T.C. 374 (1970). Petitioner argues that the bad debt was a consequence of his employee status.[31] Since Hunt was a 25-percent shareholder of Jet Air, as well as an employee, he also had an investment interest in the corporation. In determining whether the loss is proximate to his trade or business as an employee, rather than his investment interest as a shareholder, petitioner's employee status must be the *dominant motive* for making the loan. The dominant motive test was adopted by the Supreme Court in *United States v. Generes,* 405 U.S. 93, 103 (1972):

We conclude that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * *

The determination of petitioner's dominant motive is essentially a factual inquiry, with the burden of proof on petitioner. *Oddee Smith,* 55 T.C. 260 (1970), remanded for consideration in light of *Generes* at 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). Sec. 1.166-5(b), Income

---

[30] SEC. 166. BAD DEBTS.
  (d) NONBUSINESS DEBTS.—
    (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—
      (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
      (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
    (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—
      (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
      (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
[31] Respondent apparently concedes that Hunt's employee relationship with Jet Air constituted a trade or business.

Tax Regs. The only evidence in the record supporting petitioner's position is a statement by Hunt that his employment interest was the dominant motive for making the loan. This statement must be objectively examined in light of the overall record.

At the outset, we note that Hunt did not receive any salary at all from Jet Air. In our view this reduces the likelihood that Hunt's employee status was the dominant motivation behind the loan to Jet Air. While Hunt might have had the expectation of future salary payments, a loan motivated by one's status as an employee seems more plausible where its objective is to protect a present salary, rather than promote a future one.[32] Putting funds at risk under such circumstances is more characteristic of the investor.

Petitioner points out that his original investment in Jet Air was small, suggesting that his loan would not be made to preserve the small amounts already advanced. It is clear, however, that investment activities are not limited to the protection of already-committed funds. Petitioner consistently lent money to corporations in which he had an interest including Pro-Mac, Putoma, and Glover-Hunt, as well as Jet Air. Given this pattern of lending and financing, the loan to Jet Air appears more investment related than business related.[33]

Finally, we are unconvinced that Hunt could not have secured the position of Jet Air shop superintendent without making the loans. Petitioner Hunt did state on his income tax returns for 1970:

N. L. Franklin, President of Jet Air Machine Corporation, agreed that in return for Hunt making loans to the corporation to pay overdue accounts, Hunt would join the corporation as shop superintendent to revise operations so as to generate profits.

But it seems to us that Franklin would be pleased to generate profits in any event, and therefore hire the man he thought could do it. Moreover, in addition to being an expert machinist, Hunt was a director of Jet Air and a 25-percent shareholder. An

---

[32] In examining the record in *United States v. Generes, supra,* the Supreme Court compared the taxpayer's $12,000 annual salary ($7,000 after Federal tax) with his original investment in the corporation of $38,900. The fact that the taxpayer's after-tax salary was only about one-fifth of his original stock investment was a major factor in the Supreme Court's conclusion that the taxpayer's employee interest was not the dominant motivation for the loan.

[33] Since Hunt's lending activities were generally confined to corporations in which he had an interest we do not consider him to be in the trade or business of making loans for the purposes of sec. 166. See *Whipple v. Commissioner,* 373 U.S. 193 (1963).

additional 25 percent of Jet Air was owned by Purselley, his fellow shareholder in Putoma and Pro-Mac. Under these circumstances, petitioner's argument that he would not have become shop superintendent without making the loan sounds considerably less convincing.

Viewing the record as a whole, we do not believe that petitioner has demonstrated that his dominant motivation in making the loans to Jet Air was related to his status as an employee. As a result, we hold that the losses suffered by petitioner in connection with those loans should be characterized as nonbusiness bad debts under Code section 166(d).

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

SIMPSON, *J.,* dissenting in part: In my judgment, the majority's conclusion with respect to the second issue violates fundamental principles of the tax law and is not required by the decisions of this or other courts. Because it used the accrual method of accounting, Putoma was allowed to deduct the interest payments when it became obligated to make them, and such deductions reduced its tax liability. Even though it never made such payments and the obligation to make them was ultimately extinguished, the majority's conclusion would allow Putoma to retain such tax benefit.

The objective of tax accounting is to compute, on an annual basis, the net amount of a taxpayer's income which should be subject to tax—that is, the excess of his income over the expenses properly chargeable to the production of such income within the annual accounting period. See sec. 441; *Burnet v. Sanford & Brooks Co.,* 282 U.S. 359, 363, 365-366 (1931). Such income may be computed by use of the accrual method of accounting. Sec. 446. When that method is used, income must be reported for the period during which the right to the income becomes fixed and its amount is determinable in the light of the circumstances existing during the taxable year (sec. 451; sec. 1.451-(a), Income Tax Regs.), and deductions are allowable for those items which become liabilities during such taxable year, even though payment is not made until some subsequent period (sec. 461; sec. 1.461-1(a)(2), Income Tax Regs.). The deduction is allowed on

the assumption that the liability will eventually be paid. However, if, subsequently, the obligation to make the payment is modified, the taxpayer has received a tax benefit, to which, in the light of subsequent events, he was not entitled.

A similar situation arises when a cash method taxpayer deducts a payment actually made and when such payment is subsequently recovered in whole or in part, and the courts have long held that in such situations, the recovery must be reflected in income. In *Burnet v. Sanford & Brooks Co., supra,* the taxpayer sustained losses on a contract in one year and recovered the losses in a later year, and it was held that the recoveries must be included in income in the year recovered. *Cooper v. United States,* 9 F.2d 216 (8th Cir. 1925), held that the recovery of a fire loss previously deducted must be included in income in the year of recovery. *Askin & Marine Co. v. Commissioner,* 66 F.2d 776 (2d Cir. 1933), affg. 26 B.T.A. 409 (1932), held that the recovery of a debt previously deducted was includable in income in the year recovered. See also *Maryland Casualty Co. v. United States,* 251 U.S. 342 (1920); *Carr v. Commissioner,* 28 F.2d 551 (5th Cir. 1928), affg. 6 B.T.A. 541 (1927); *Davidson Grocery Co. v. Lucas,* 37 F.2d 806 (D.C. Cir. 1930), revg. 12 B.T.A. 181 (1928); *Putnam National Bank v. Commissioner,* 50 F.2d 158 (5th Cir. 1931), affg. 20 B.T.A. 45 (1930); *Commissioner v. Liberty Bank & Trust Co.,* 59 F.2d 320 (6th Cir. 1932), revg. 14 B.T.A. 1428 (1929); *Helvering v. State-Planters Bank & Trust Co.,* 130 F.2d 44 (4th Cir. 1942), revg. 45 B.T.A. 630 (1941); *Houbigant, Inc.,* 31 B.T.A. 954 (1934), affd. per curiam 80 F.2d 1012 (2d Cir. 1936), cert. denied 298 U.S. 669 (1936). Thus, the principle is well established that when the grounds for a deduction are modified by subsequent events, there must be an adjustment in income to reflect the changed circumstances.[1] In time, the courts held that in making the adjustment, the extent of the tax benefit realized in the earlier year should be taken into consideration, and the rule came to be referred to as the tax benefit rule. Sec. 111; *Merchants Nat. Bank of Mobile v. Commissioner,* 199 F.2d 657 (5th Cir. 1952), affg. 14 T.C. 1375 (1950); *West Seattle National Bank of Seattle v. Commissioner,* 288 F.2d 47 (9th Cir.

---

[1] If both the payor and payee used the accrual method of accounting, and the payee reported the right to the payment as income, these circumstances may alter the necessity of making an accounting adjustment when the liability is subsequently modified. O'Hare, "Statutory Nonrecognition of Income and the Overriding Principle of the Tax Benefit Rule in the Taxation of Corporations and Shareholders," 27 Tax L. Rev. 215, 240-244 (1972).

1961), affg. 33 T.C. 341 (1959); *Bear Manufacturing Co. v. United States,* 430 F.2d 152 (7th Cir. 1970), cert. denied 400 U.S. 1021 (1971); *Mayfair Minerals, Inc. v. Commissioner,* 456 F.2d 622 (5th Cir. 1972), affg. per curiam 56 T.C. 82 (1971); *Alice Phelan Sullivan Corp. v. United States,* 381 F.2d 399 (Ct. Cl. 1967); *Motor Products Corp.,* 47 B.T.A. 983 (1942), affd. per curiam 142 F.2d 449 (6th Cir. 1944).

Recently, the courts have recognized that such principle should be applied even more broadly. For example, the courts have held that even though a statutory provision declared a transaction did not result in taxable income, the statute was not intended to apply when the transaction resulted in a tax benefit to the taxpayer because he recovered an item previously deducted. *Connery v. United States,* 460 F.2d 1130 (3d Cir. 1972); *Spitalny v. United States,* 430 F.2d 195 (9th Cir. 1970); *Commissioner v. Anders,* 414 F.2d 1283 (10th Cir. 1969); *Anders v. United States,* 462 F.2d 1147 (Ct. Cl. 1972), cert. denied 409 U.S. 1064 (1972); *Estate of David B. Munter,* 63 T.C. 663 (1975). In like manner, such principle should be applied to the tax benefit received by Putoma as a result of the deduction of the interest obligations which it was not required to make.

In the cases, there has arisen some unfortunate confusion between the tax benefit rule and the rule that income may result from the cancellation of indebtedness. The tax benefit rule is in effect an accounting rule. On the other hand, the cancellation of indebtedness may, in effect, be viewed as a substitute for the transfer of money, property, or other things of value, or it may be viewed as the nongratuitous receipt of the goods or services which underlies the indebtedness—in either event, it may give rise to taxable income. Sec. 1.61-12, Income Tax Regs.; *Commissioner v. Jacobson,* 336 U.S. 28 (1949); *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931). The distinction between the two rules may be illustrated by an example: If a taxpayer, who uses the accrual method of accounting, incurs a liability to pay $100 of rent in 1976, the deduction results in a tax saving for him. If the liability for rent is forgiven in 1977, there must be an accounting adjustment. If the cancellation of the liability was gratuitous, the accounting adjustment is the only tax consequence of such cancellation. The taxpayer is then in the same situation as a taxpayer who used the cash method of accounting and who would therefore never have been entitled to

the deduction and the tax saving. On the other hand, if the liability was forgiven as a means of paying the debtor for services rendered, the debtor is required to report $100 as income in such year and pay a tax on it. In effect, the debtor has fulfilled his obligation to pay rent for the preceding year, and the creditor has handed that money back to him as payment for services rendered. Although the debtor is required to pay an additional tax in 1977 in both situations, that result comes about for different reasons.

In the cases relied upon by the majority, the question for decision was whether the cancellation was gratuitous. Those cases did not focus on whether there should be an accounting adjustment as a result of a prior deduction, and they should not control our decision in this case. In *Commissioner v. Auto Strop Safety Razor Co.,* 74 F.2d 226 (2d Cir. 1934), and *Carroll-McCreary Co. v. Commissioner,* 124 F.2d 303 (2d Cir. 1941), the courts were merely asked to find whether the cancellation of the indebtedness was gratuitous, and the income tax regulations then in effect expressly provided that if the cancellation was gratuitous, it resulted in no cancellation of indebtedness income. Likewise, in *Helvering v. American Dental Co.,* 318 U.S. 322 (1943), the Supreme Court's concern was with whether the cancellation was gratuitous, and since it found the act to be gratuitous, it held that such transaction did not result in cancellation of indebtedness income. Although the Court recognized that the indebtedness had been previously deducted, the Court recited that the only issue presented by its grant of certiorari was whether income resulted from the cancellation of rent and interest which were owed by the taxpayer. Thus, the Court was dealing with the principle of whether income results from the cancellation of such obligations, irrespective of whether the debtor used the accrual method of accounting and had already deducted such rent or interest, and the Court did not focus on whether an accounting adjustment should be made upon the forgiveness of items which had been previously deducted. Furthermore, shortly thereafter, when the Supreme Court was considering the applicability of the tax benefit rule in *Dobson v. Commissioner,* 320 U.S. 489, 506 n. 36 (1943), the Court appeared to assume that such rule is applicable with respect to the "cancellation of expenses or interest previously reported as accrued." The cases that have been decided since *American Dental* also do not expressly pass on the necessity of an

accounting adjustment if the indebtedness canceled had been previously deducted and had given rise to a tax benefit; they only deal with the issue of whether cancellation of indebtedness income was realized. *Reynolds v. Boos,* 188 F.2d 322 (8th Cir. 1951); *Hartland Associates,* 54 T.C. 1580 (1970); *Utilities & Industries Corp.,* 41 T.C. 888 (1964), revd. on other grounds sub nom. *The South Bay Corp. v. Commissioner,* 345 F.2d 698 (2d Cir. 1965).

This Court deals exclusively in matters concerning Federal taxes, and we are expected to have expertise in such matters.[2] As such, we have a special obligation to understand and apply properly the principles of the tax law. Everyone recognizes that because of the tax benefit realized by Putoma as a result of the prior deduction of the interest obligations, there should be an accounting adjustment when the corporation is released from its obligation to make such payments, and we, as the experts in such matters, should attempt to clarify this area of the law and not add to its confusion by extending doctrines to situations where they should not be applied. Moreover, if we abrogate our

---

[2] Such a view was articulated by Mr. Justice Stewart at the dedication of the Tax Court building when he said:

"It is true that the Supreme Court does not review many tax cases, but I think the real reason for this is *not* the complexity of the cases, but rather a basic confidence in the experienced ability and perceptive understanding of the United States Tax Court. It is significant that both the very first and the very most recent of our Court's decisions involving cases originating in the Tax Court constituted affirmances of the Tax Court's judgments. The earliest case, a 1927 decision, was *Blair v. Oesterlein Machine Co.* This was a landmark decision involving the very judicial credentials of the Board of Tax Appeals, as it was then called. The Supreme Court in that case rejected an attempt by the Commissioner to limit the jurisdiction and powers of the Board. The Supreme Court's most recent review of a Tax Court decision was in the case of *Commissioner v. Idaho Power Co.,* this year, in which our Court's opinion upholding the Tax Court was written by Mr. Justice Blackmun, who is here today.

"The Supreme Court has always had great respect for the competence and independence of the Tax Court. In fact, in the *Dobson* case in 1943, the Supreme Court, speaking through Mr. Justice Jackson, adopted a rule precluding appellate review of Tax Court determinations in the absence of exceptional or extraordinary circumstances. That rule lasted for only 5 years. It was changed by Congress in 1948.

"But good ideas die hard, and some Justices never fully accepted the wisdom of the Congressional verdict on the *Dobson* case. In the later *Arrowsmith* case, Mr. Justice Jackson again paid a meaningful tribute to the Tax Court, and I quote: "In spite of the gelding of Dobson ... I still think the Tax Court is a more competent and steady influence toward a systematic body of tax law than our sporadic omnipotence in a field beset with invisible boomerangs." That time, of course, Mr. Justice Jackson's thoughts were expressed in a dissenting opinion.

"Appropriate judicial restraint prevents me from taking this occasion to bemoan the passing of the doctrine of the *Dobson* case. Nevertheless, the spirit behind that decision—a respect for the ability and integrity of the United States Tax Court—is one in which I know all the members of our Court fully concur. * * * [63 T.C. XVII-XVIII (1974).]"

responsibility and pass up this opportunity to clarify the law, we invite, nay require, legislative action. Everyone deplores the complexity of the Federal tax laws, and here we have an opportunity to avoid making it more complex. If we fail to clarify the applicability of the tax benefit rule and the rule relating to income from the cancellation of indebtedness, it will become necessary for Congress to amend the statutes and add further conditions and restrictions to them.

RAUM and STERRETT, *JJ.,* agree with this dissent.