IVAN J. AND MAXINE SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROBERT J. AND BESS L. BELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket Nos. 17367-92, 17383-92[1]
United States Tax Court
T.C. Memo 1994-640; 1994 Tax Ct. Memo LEXIS 661; 68 T.C.M. (CCH) 1538; December 29, 1994, Filed *661 Decisions will be entered under Rule 155. For petitioners: James Benham. For respondent: J. Robert Cuatto and John R. Mikalchus. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: By separate notices of deficiency, respondent determined deficiencies in the 1989 Federal income taxes of Ivan J. and Maxine Smith (the Smiths) and Robert J. and Bess L. Bell (the Bells) in the respective amounts of $ 30,268 and $ 30,079. The Smiths and Bells are collectively referred to as petitioners. The issues for decision arise out of Ivan Smith's (Smith) and Robert Bell's (Bell) involvement in the development and ownership of a mobile home and recreational vehicle (RV) park in Safford, Arizona, and the payments by their partnership (Smith & Bell Construction Co.) to First United State Credit Union (the credit union) in satisfaction of petitioners' guarantees made in connection with a loan from the credit union to the corporate owner of the park, Safford Park Group, Inc. (SPG). The specific issues involved are: (1) Whether petitioners are entitled to claimed bad debt deductions for payments made to the credit union by their partnership with respect to petitioners' guarantees; *662 (2) in the event we decide that petitioners are entitled to the claimed bad debt deductions, then (a) whether the debt from SPG to the credit union constituted a business or nonbusiness bad debt; and (b) whether petitioners are entitled to passive activity losses resulting from an interest deduction claimed by SPG with respect to its debt to the credit union; and (3) whether petitioners are entitled to deductions for certain legal and accounting expenses incurred by Smith & Bell Construction Co. Following trial, we granted respondent leave to amend her Answers to conform to the evidence presented at trial pursuant to Rule 41. Respondent's Amendments to Answer allege an increase in deficiencies of $ 10,298 with respect to the Smiths and $ 9,820 with respect to the Bells in the event we conclude that petitioners are not entitled to the claimed bad debt deductions. Alternatively, respondent alleges that in the event we conclude that petitioners are entitled to the claimed bad debt deductions, Smiths' and Bells' deficiencies should be increased in the respective amounts of $ 1,348 and $ 1,144. Respondent bases her alternative position on the disallowance of the passive activity losses *663 arising from deductions reported by SPG and claimed on petitioners' 1989 Federal income tax returns. In their opening brief, petitioners concede that they are not entitled to $ 4,086 of the claimed passive activity losses. All section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Safford, Arizona, at the time they filed their respective petitions in these cases. The Smiths and Bells both timely filed joint Federal income tax returns for 1989. Smith & Bell Construction Co.
Smith and Bell formed Smith & Bell Construction Co. (S & B), an Arizona general partnership, in 1974. They have been 50-percent partners in S & B at all times relevant to this case. S & B is engaged in the construction business, primarily earth moving, grading of land, site preparation, and construction of roadways. In 1986, S & B's net worth was approximately $ 2 million. Safford Park Group, Inc.
*664 In 1986, Bell was approached by Rodney Alder (R. Alder) with a business proposition to acquire certain property located in downtown Safford and build a mobile home and RV park thereon. The park was to be known as Lexington Pines. Alder proposed that Smith and Bell invest in the project and, in exchange, S & B would be awarded all the construction work for the project on a noncompetitive basis. It was anticipated that the cost to construct and equip the mobile home and RV park would be approximately $ 1,325,000, all coming from borrowed funds, that it would be "rented-up" upon completion, and that it could be sold for approximately $ 1,545,000. The $ 1,545,000 figure was based on an appraisal obtained prior to the parties' agreeing to develop the mobile home and RV park. Smith and Bell agreed to participate in the project in order to provide work for S & B. Obtaining such work enabled S & B to retain its core employees at a time when business was slow. S & B agreed to do the construction work for the project for $ 864,876.10; it was anticipated that S & B would earn a 20-percent profit, or approximately $ 173,000. On June 3, 1986, SPG was incorporated. SPG's stock was initially *665 owned as follows: Number
Subscriber's Name
Amount Paid
of Shares
R. Alder
$ 6,000
6,000
Tim Alder (R. Alder's son)
6,000
6,000
Smith
4,000
4,000
Bell
4,000
4,000
The initial officers of SPG were: R. Alder - president; Smith and Bell - vice presidents; and T. Alder - secretary and treasurer. Sometime prior to 1989, Smith and Bell became the only shareholders of SPG, [2] and SPG elected subchapter S status for Federal tax purposes. To finance the construction of the project, SPG borrowed $ 1,325,000 from the credit union on July 2, 1986. As a condition of obtaining the loan, the credit union required petitioners and the Alders to sign the construction loan note, both as makers and guarantors. [3] Petitioners' Guarantee Agreements provided, in part: Subject to the provisions hereinafter set forth, Guarantors absolutely and unconditionally hereby jointly and severally guarantee performance of all obligations *666 in the Loan Documents and payment to Lender or its order of the amount of the principal and interest of the Note and amounts due under the Loan Documents when the indebtedness evidenced thereby becomes due and payable, whether by maturity of principal, acceleration of the due date of the entire principal balance, or otherwise, and of any and all additional sums which may be or become payable by virtue of the Note and/or Loan Documents, including but not limited to costs and attorneys' fees, or by virtue of any advances by Lender pursuant to any term or provision of the Loan Documents.
*667 The credit union also required that $ 250,000 be deposited with it as collateral to ensure that the project would be timely completed and that the borrowers' and guarantors' obligations under the loan documents would be performed. To meet this requirement, S & B purchased an 8-month, $ 250,000 certificate of deposit from, and deposited it as a cash performance bond with, the credit union. The construction loan was further secured by a Deed of Trust, Assignment of Rents, and Security Agreement. During 1989, in addition to being indebted to the credit union, SPG was indebted to The Farmers and Merchants Bank. As of December 30, 1988, SPG owed The Farmers and Merchants Bank $ 15,771.06. S & B paid $ 2,561 in interest to The Farmers and Merchants Bank with regard to this debt in 1989. SPG anticipated selling the mobile home and RV park for approximately $ 1,545,000. The anticipated profit from such sale was $ 200,000, with Smith and Bell each receiving a profit of $ 40,000. Delays were encountered in the construction of the project. It was expected that the project would be completed in 6 to 7 months, but due to poor weather conditions, the project took 10 months to complete. *668 Following the completion of the project, around May of 1987, S & B demanded the return of its $ 250,000 from the credit union. The credit union refused to release the $ 250,000 because the construction loan note was then in default. S & B thereupon engaged a law firm to protect its interests. In 1989, S & B paid $ 26,991 in legal and accounting fees in connection with the Lexington Pines project. Because SPG lacked the ability to make payments on the loan to the credit union, S & B made such payments. The interest S & B paid to the credit union in 1989 totaled $ 227,229. S & B's 1989 U.S. Partnership Return of Income
On its 1989 U.S. Partnership Return of Income, S & B reported the $ 227,229 that it paid on SPG's loan to the credit union as a business bad debt deduction. S & B also reported a $ 26,991 business expense deduction for legal and accounting expenses paid in connection with the Lexington Pines project. SPG's 1989 U.S. Income Tax Return for an S Corporation
SPG claimed a $ 229,790 interest deduction on its 1989 Form 1120S U.S. Income Tax Return for an S Corporation. This deduction included the $ 227,229 of interest that S & B paid to the credit union, *669 and the $ 2,561 of interest that S & B paid to The Farmers and Merchants Bank. On Schedules K for Bell and Smith (which were attached to SPG's 1989 Form 1120S), SPG reported a $ 148,534 flow-through loss to each shareholder. The accumulated adjustments account of SPG (Schedule M of SPG's Form 1120S) for 1989 reflected an addition to SPG's capital of $ 509,119. Part of this increase is attributable to a reduction of $ 275,443 in loans to SPG from its shareholders (as reflected on Schedule L) from $ 356,146 to $ 80,703. The difference of $ 233,676 ($ 509,119 - $ 275,443) apparently is the amount of interest paid on the debts to the credit union and The Farmers & Merchants Bank ($ 229,790), plus the payment of principal to The Farmers & Merchants Bank. [4]
Petitioners' 1989 Federal Income Tax Returns
Petitioners each reported $ 90,930 in income from S & B in 1989. In addition, on Forms 8582, Passive Activity *670 Loss Limitations, attached to the 1989 returns, petitioners each reported a $ 55,351 [5] passive activity loss, which related to SPG's $ 227,229 interest deduction. These losses were subject to the passive activity loss limitation, which reduced the allowable amounts to $ 11,070. Notices of Deficiency
The notices of deficiency are based on respondent's determination that S & B's $ 227,229 bad debt in 1989 constituted a nonbusiness rather than a business bad debt. Specifically, the notices of deficiency recharacterize petitioners' business bad debt deductions as short-term capital losses, rather than as deductible against ordinary income. In addition, the notices of deficiency disallow $ 1,189 of each petitioner's claimed legal and accounting deductions, corresponding to a $ 2,378 adjustment to S & B's legal and accounting deduction. *671 Taken together, respondent's adjustments increase Smith's and Bell's incomes with respect to S & B from $ 90,930 to $ 205,733. Amendments to Answer
The increased deficiencies asserted in respondent's Amendments to Answer are based on evidence presented at trial that the $ 227,229 interest deduction SPG claimed on its 1989 Form 1120Sarose out of the same payments that S & B claimed as a bad debt deduction on its 1989 partnership return; thus, a double deduction for the same payment was claimed. Respondent's Amendments to Answer state that on SPG's tax return the $ 227,229 payment from S & B to the credit union was reported as a shareholder contribution to capital, that petitioners claimed passive activity losses with respect to this interest payment, and that as a result petitioners should be held to the reported characterization. Accordingly, respondent argues that petitioners are not entitled to a bad debt deduction of any kind. In the alternative, the Amendments to Answer state that should we hold that petitioners are entitled to bad debt deductions, petitioners should be denied the portion of their share of SPG's interest deductions that relates to the same $ 227,229 *672 that they claimed as bad debt deductions through S & B. This reduction would decrease petitioners' 1989 passive activity losses. As previously stated, petitioners concede that they are not entitled to $ 4,086 of the claimed 1989 passive activity losses. OPINION 1. Bad Debt Deduction
Initially, we must determine whether petitioners are entitled to bad debt deductions of any kind for S & B's payments to the credit union arising out of SPG's construction loan. Because this issue arises as a result of the assertions made in the Amendments to Answer, respondent bears the burden of proof. Rule 142(a). Section 166(a) provides that a taxpayer may deduct a bad debt in full in the year it becomes worthless. Where one taxpayer guarantees the debt of another, and payment on such guarantee is made to the creditor, the guarantor (if unable to recover from the debtor) is entitled to a bad debt deduction for the year in which payment under the guarantee is made. Putnam v. Commissioner, 352 U.S. 82, 85, 88-89 (1956). Upon payment of a debt by a guarantor, the debtor's obligation to the creditor becomes an obligation to the guarantor through subrogation. *673 Id.
To qualify for the bad debt deduction, there must be a debtor-creditor relationship. Sec. 1.166-1(c), Income Tax Regs. Whether a bona fide debtor-creditor relationship exists is a question of fact which ultimately requires a determination as to whether there was a genuine intention to create a debt, with reasonable expectation of repayment, and whether that intent comports with the economic reality of creating a debtor-creditor relationship. Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973); see also A.R. Lantz Co. v. United States, 424 F.2d 1330, 1334 (9th Cir. 1970); Fisher v. Commissioner, 54 T.C. 905, 909 (1970). In the instant case, respondent accepts the bona fides of the debt between SPG and the credit union and the validity of petitioners' personal guarantees with respect to that debt. However, respondent claims that S & B had no involvement, either as maker or guarantor, with respect to such debtor-creditor relationship. Respondent contends that the money ultimately paid by S & B to the credit union should be deemed first as if it were a partnership *674 distribution to Smith and Bell, then as a contribution by Smith and Bell to the capital of SPG, and finally as a payment by SPG to the credit union. Using this scenario, respondent asserts that SPG never defaulted on its loan to the credit union and thus Smith and Bell were never required to make good on their guarantees. We believe respondent's scenario is erroneous. Rather, we find that S & B made the payments to the credit union on petitioners' behalf to satisfy petitioners' guarantees to the credit union. We agree with respondent that S & B never was obligated to the credit union either as maker or guarantor of the loan. However, we disagree with respondent's treatment as to how the money flowed. The evidence in this case does not support a finding that Smith and Bell contributed any money, other than their initial capital contributions, to SPG. Rather, we conclude that S & B was used as a vehicle by Smith and Bell to satisfy their personal guarantees. We also conclude that SPG's loan with the credit union was in default, and petitioners' right of subrogation against SPG became worthless at the time S & B made the payments to the credit union. [6]
*675 In Marcello v. Commissioner, T.C. Memo. 1969-189, we refused to sustain the Commissioner's disallowance of claimed interest deductions by a partnership. There, the note in question was signed on behalf of the partnership by each of its four partners and individually guaranteed by them. The Commissioner argued that the evidence did not establish that the debt was that of the partnership. Rather, the Commissioner concluded that the liability was that of the individual partners. We determined otherwise, stating: the four individuals were equal partners * * * and were equal guarantors of the note. Each of them is, therefore, entitled to deduct his proportionate share of the interest payments, whether such payments were made in discharge of a partnership liability or were made with funds constructively distributed to them and used to discharge their personal liabilities. Since the obligors are identical with the individuals who composed the partnership, this is not a situation where the "interest expense of partner A" is being "deducted by the partnership so as to lessen the taxable income of partner B." Cf. Marcello v. Commissioner, 380 F.2d 499, 503 fn. 10 *676 (C.A. 5, 1967), affirming in part a Memorandum Opinion of this Court. [Emphasis added.]
Id. While Marcello is distinguishable from the present case, its insights regarding payments by a partnership on behalf of its partners are pertinent. In conclusion, we hold that petitioners are entitled to bad debt deductions for the payments S & B made to the credit union on their personal guarantees. 2.a. Business vs. Nonbusiness Bad Debt
As a consequence of our finding that a bad debt existed, we must now determine whether such bad debt constituted a section 166(a) business bad debt or a section 166(d) nonbusiness bad debt. Petitioners contend that S & B's 1989 payment pursuant to petitioners' personal guarantees of the SPG loan gave rise to a business bad debt deduction under section 166(a)(1). Respondent contends that if petitioners are entitled to a bad debt deduction, then such a deduction is a nonbusiness bad debt deduction, subject to the limitation of section 166(d)(1). Petitioners bear the burden of proof on this issue. Rule 142(a). Section 166(a)(1) provides that "There shall be allowed as a deduction any debt which becomes worthless within the taxableyear." *677 Section 166(d)(1) limits the deductibility of nonbusiness debts of a taxpayer other than a corporation. Generally, for individual taxpayers: (1) Section 166(a) does not apply to nonbusiness bad debts; (2) there is no deduction for a partially worthless bad debt; and (3) a nonbusiness bad debt is deductible only as a short-term capital loss. Sec. 166(d); sec. 1.166-5, Income Tax Regs. A nonbusiness debt is a debt other than "a debt created or acquired * * * in connection with a trade or business of the taxpayer". Sec. 166(d)(2)(A). Whether a debt is a business or nonbusiness debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs. A business bad debt deduction is available only if the taxpayer can establish that: (1) He was engaged in a trade or business, and (2) the acquisition or worthlessness of the debt was proximately related to the conduct of such trade or business. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs. Whether the taxpayer is engaged in a trade or business is a question of fact. United States v. Generes, 405 U.S. 93, 104 (1972); *678 Dorminey v. Commissioner, 26 T.C. 940, 945 (1956). When a taxpayer agrees to guarantee a debt in the course of his trade or business, a payment by the taxpayer in discharge of part or all of the taxpayer's obligations as a guarantor is treated as a business bad debt becoming worthless in the taxable year in which the payment is made. If the guarantee is made in the course of the taxpayer's trade or business, then the loss is deductible against ordinary income. Sec. 1.166-9(a), Income Tax Regs. If on the other hand, the agreement guaranteeing the debt is entered into for profit, but not in the course of the taxpayer's trade or business, then the loss is a short-term capital loss in the year in which the guarantor pays the debt. Sec. 1.166-9(b), Income Tax Regs.
To determine whether a particular guarantee is proximately related to the taxpayer's trade or business, we measure the taxpayer's dominant motive for becoming a guarantor at the time of entering into the guarantee rather than the date upon which a payment in discharge is made. United States v. Generes, supra; French v. United States, 487 F.2d 1246, 1248-1249 (1st Cir. 1973). *679 In assessing such dominant motive, we generally look at objective facts. United States v. Generes, supra.
A shareholder of a corporation is not engaged in the trade or business in which the corporation is engaged unless the shareholder engages in such trade or business apart from his affiliation with the corporation. See Dalton v. Bowers, 287 U.S. 404, 407-408 (1932). It is well recognized that a taxpayer may establish the requisite business nexus for deductibility of a bad debt under section 166(a) by proving that the dominant motive in incurring the debt was to protect his employment. United States v. Generes, supra at 104; Shinefeld v. Commissioner, 65 T.C. 1092, 1096-1099 (1976). If, however, the taxpayer's dominant motivation for incurring the obligation was to protect his investment in the corporation, then the guarantee payment results in a nonbusiness bad debt. United States v. Generes, supra at 100-101. A taxpayer's dominant motive can be determined by examining how the taxpayer would have benefited from the loan *680 or guarantee had the loan "not gone bad". TennesseeSec., Inc. v. Commissioner, 674 F.2d 570, 575 (6th Cir. 1982), affg. T.C. Memo. 1978-434. For instance, if the dominant motive of the guarantee is to increase the value of the taxpayer's stock in the corporation, i.e., capital gains, then the loan is considered a nonbusiness investment. If however the dominant motive of the guarantee is to increase the taxpayer's salary, then the debt is considered a business debt. If both motives are present, then a consideration of all of the relevant facts, emphasizing the objective factors and giving controlling weight to no single factor (the Generes approach), is to be used. Litwin v. United States, 67 AFTR 2d 91-1098, 91-1 USTC par. 50,229 (D. Kan. 1991), affd. 983 F.2d 997, 1000-1001 (10th Cir. 1993). Here, it is clear that: (1) Petitioners (through S & B) were engaged in the construction business, and (2) the guarantees and worthlessness of the debt were proximately related to the conduct of such business. See Putoma Corp. v. Commissioner, supra. *681 Petitioners personally obligated themselves as guarantors of the construction loan. The guarantees were made to obtain financing to construct Lexington Pines, which project was to be constructed by petitioners' partnership--S & B. Without the loan, the Lexington Pines construction project would not have come into fruition and S & B would not have received the related construction contract. We found petitioners to be credible witnesses and the following colloquy informative: Petitioners' Counsel: * * * can you tell the Court approximately what Mr. Naylor's * * * appraisal was or what you considered it to be of the completed project as of 1986. * * * Mr. Smith: Well, Naylor said that if it was built like the plans, it'd be worth a millon and a half, $ 1,550,000. The Court: And how much were you going * * * to be putting in? You were going to borrow -- what? -- a million? Mr. Smith: We were borrowing $ 1,325,000. The Court: So you thought you were going to be realizing about $ 200,000 out of the deal, profit? Mr. Smith: Yes. The Court: In addition, of course, you were going to get the contract to do the -- Mr. Smith: *682 In addition, we was [sic] going to get the contract to build it. The Court: Was there one reason that you went into it which dominated the other? In other words, if you weren't going to get the contract to do the work, would you have entered in to this arrangement? Mr. Smith: Absolutely not. We're not in that kind of business. It would have been good to share in that $ 200,000 or whatever it might be, but we normally make about 20 percent on our construction, on our construction jobs. And the construction part, what we done, [sic] was around $ 800-and-some-odd-thousand, and that's mostly what we was [sic] looking at, is the profit off of that job. Also, in that time '86 was kind of slow, and we had hands we didn't want to leave us, and we was [sic] looking for work.
It is evident that S & B entered into the project to make a profit in the course of its trade or business and to provide employment for its construction crew. See TennesseeSec., Inc. v. Commissioner, 674 F.2d at 575; United States v. Generes, supra. Although petitioners obviously wanted to profit from their investment in SPG, we *683 are satisfied that their dominant motivation for guaranteeing the construction loan was to realize a profit from their trade or business (S & B), as distinct from realizing a profit on their investment in SPG. See United States v. Generes, supra at 103-104. Petitioners' combined $ 8,000 investment in SPG was small in comparison to the $ 1,325,000 construction loan. Thus, the risk they took by personally guaranteeing the loan far exceeded the value of their collective investment in SPG. See Estate of Allen v. Commissioner, T.C. Memo. 1982-303. Further, the profits that petitioners anticipated from their collective investment in SPG (as shareholders) were small in comparison to the anticipated profits that they would receive from S & B (as partners). Upon the sale of Lexington Park, petitioners anticipated that they would realize a profit of $ 40,000 as shareholders of SPG. In contrast, by constructing Lexington Pines, S & B expected to earn a profit of approximately $ 173,000, and thus Smith and Bell each expected to earn an $ 86,500 business profit. Accordingly, we hold that the underlying bad debt constituted a *684 business bad debt. Therefore, the losses are deductible against petitioners' 1989 ordinary incomes. 2.b. Passive Activity Loss
The next issue is whether petitioners are entitled to passive activity losses [7] that arose out of the interest deduction SPG claimed on its 1989 Form 1120S. In the Amendments to Answer, respondent argues that if we hold that petitioners are entitled to bad debt deductions, then petitioners should be denied the portion of their shares of SPG's interest deduction that relates to the same $ 227,229 that they already claimed as bad debt deductions through S & B. As stated, petitioners conceded this point on brief, agreeing that they are not entitled to $ 4,086 of their claimed passive activity losses. The parties' joint conclusion on this issue is consistent with our opinion herein. SPG characterized S & B's payments to the credit union as a $ 227,229 interest deduction. Because we held that S & B made these payments pursuant to petitioners' guarantees, and petitioners are entitled to business bad debt deductions through S & B, petitioners are not entitled to passive activity losses through SPG. Such would constitute double-counting. Accordingly, *685 petitioners are not entitled to passive activity losses resulting from SPG's interest deduction. 3. Legal and Accounting Expenses
The final issue is whether S & B is entitled to deductions for certain legal and accounting expenses incurred by S & B. Petitioners argue that respondent erred in making an *686 adjustment of $ 2,378 in the notices of deficiency, disallowing their distributive shares of these legal and accounting expenses. Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Respondent concedes that the expenses have been substantiated, but contends that petitioners are not entitled to deductions for such expenses because petitioners failed to prove the business purpose of these expenses. We are satisfied that the legal expenses were directly related to S & B's construction business. S & B incurred these expenses in attempting to obtain the return of the $ 250,000 that it deposited with the credit union as a performance bond. Because these legal and accounting fees were incurred in connection with S & B's business operations, we hold that the $ 2,378 is deductible as an ordinary and necessary business expense pursuant to section 162(a). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. These cases were consolidated for trial, briefing, and opinion.↩
2. The record does not indicate when or how Smith and Bell became the only shareholders of SPG.↩
3. The loan agreement provided that: "Guarantors are shareholders of Borrower, and the loan is of benefit to them as such." The construction loan note provided: The undersigned [petitioners and the Alders] are jointly, severally and personally obligated as makers of this Note and are not merely guarantors, sureties, indemnitors or signing in accommodation.
Notwithstanding the fact that the loan note provided that petitioners and the Alders were obligated as makers of the note, petitioners and respondent based their proposed findings of fact, legal positions, and arguments solely upon petitioners' status as guarantors of SPG's debt. We accordingly will treat petitioners' status under the note solely as that of guarantors of the note.↩
4. The exact amount of the principal paid to The Farmers & Merchants Bank is not disclosed in the record.↩
5. There is no explanation in the record as to why petitioners reported $ 55,351 in passive activity losses rather than $ 148,534, as SPG reported on petitioners' Schedules K.↩
6. While the provisions of sec. 731 may be applicable as a result of our finding that S & B made a payment to the credit union on behalf of its partners, respondent did not assert the consequences of sec. 731 in the notices of deficiency.↩
7. Sec. 469 was enacted in reaction to taxpayers' attempts to reduce taxable income by deducting "passive activity" losses incurred in the conduct of any trade or business in which they did not materially participate (typically a limited partnership). This objective was achieved by denying the taxpayer the right to deduct passive activity losses from income unrelated to such activities, and permitting such losses to be used only to offset passive income. Sec. 469(d)(1) generally provides that the term "passive activity loss" means the amount, if any, by which (A) the aggregate losses from all passive activities for the taxable year exceeds (B) the aggregate income from all passive activities for such year.↩